# DECLARATION OF DAVID FIOCCOLA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

**SOUTHWIRE COMPANY, LLC,**
*Plaintiff*,

v.

**COPPERWELD BIMETALLICS, LLC,**
*Defendant*.

**Civil Action No.
3:22-CV-00146-TCB**

## DECLARATION OF DAVID FIOCCOLA

I, David Fioccola, declare under penalty of perjury that the following is true:

1.      I am counsel at the law firm Morrison & Foerster LLP, counsel of record for Defendant Copperweld Bimetallics, LLC ("Copperweld").  I submit this declaration in support of Copperweld's Motion to Dismiss, Stay, or Transfer Southwire Company, LLC's ("Southwire") Complaint.

2.      On September 30, 2021, Copperweld filed an action against Cerro before the Honorable Judge Madeline H. Haikala in Federal District Court for the Northern District of Alabama, captioned *Copperweld Bimetallics v. Cerro Wire*, Case No. 5:21-cv-01310-MHH (N.D. Ala.) (the "Alabama Action").  In the Alabama Action, Copperweld initially alleged that Cerro engaged in false advertising and tortious interference with business relations in statements Cerro made regarding

1

Copperweld's CCA.  A true and correct copy of the docket in the Alabama Action is attached hereto as Exhibit A.

3.    On July 15, 2022, following the discovery of additional information, Copperweld and Cerro jointly sought leave to file amended or supplemental pleadings and for entry of a first amended scheduling order in the Alabama Action, requesting until August 10, 2022, to prepare the amended pleadings.  *See* Exhibit A (ECF 48).  Copperweld's request for leave to file an amended complaint was governed by a court-mandated scheduling order setting July 20, 2022, as the deadline to add causes of action, defenses, or parties, as well as Federal Rule of Civil Procedure 15(a)(2).  *See* Exhibit A (ECF 46).

4.    On August 10, 2022, Copperweld submitted its proposed Second Amended Complaint to Judge Haikala, adding antitrust claims against Cerro, Southwire, and Encore for conspiracy to restrain trade under § 1 of the Sherman Act, 15 U.S.C. § 1.  *See* Exhibit A (ECF 50).  That same day, Copperweld sent Southwire a courtesy copy of the proposed Second Amended Complaint.  A true and correct copy of this correspondence from Craig York, CEO of Copperweld, to Rich Stinson, President and CEO of Southwire, is attached hereto as Exhibit B.

5.    On August 18, 2022, eight days after receiving a copy of Copperweld's proposed amended pleading, Southwire filed the instant action.  Southwire was on notice of the procedural status of the Alabama Action.  (ECF 1).

6.    On August 22, 2022, Judge Haikala granted Copperweld's request for leave to file the Second Amended Complaint in the Alabama Action and instructed Copperweld to file its amended pleading by August 23, 2022.  *See* Exhibit A (ECF 55).  Attached hereto as Exhibit C is a true and correct copy of the transcript of the August 22, 2022, status conference before Judge Haikala in the Alabama Action.  In reaching her decision, Judge Haikala was fully aware that Southwire filed this declaratory judgment action directed at Copperweld's antitrust claims.  *See* Exhibit C.

7.    Pursuant to Judge Haikala's instruction, Copperweld filed the Second Amended Complaint in the Alabama Action to include the antitrust allegations on August 23, 2022, seeking a finding that defendants, including Southwire, "have violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and Code of Ala. § 6-5-60." That action is currently proceeding against Encore, Cerro, and Southwire in the Federal District Court for the Northern District of Alabama.  *See* Exhibit A (ECF 60).  A true and correct copy of the as-filed Alabama Antitrust Complaint is attached hereto as Exhibit D.

Dated: September 30, 2022                */s/ David J. Fioccola*
                                         DAVID J. FIOCCOLA

# Exhibit A

STAYED,PROTECTIVE ORDER

# U.S. District Court
## Northern District of Alabama (Northeastern)
## CIVIL DOCKET FOR CASE #: 5:21−cv−01310−MHH

Copperweld Bimetallics, LLC v. Cerro Wire LLC
Assigned to: Judge Madeline Hughes Haikala
Cause: 15:1125 Trademark Infringement (Lanham Act)

Date Filed: 09/30/2021
Jury Demand: Both
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Copperweld Bimetallics, LLC**                    represented by    **Alan D Mathis**
BUTLER SNOW LLP
ONE FEDERAL PLACE
1819 5th Avenue North Suite 1000
Birmingham, AL 35203
205−297−2239
Fax: 205−297−2201
Email: alan.mathis@butlersnow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Murray**
FRANKFURT BURNIT KLEIN & SELZ
PC
28 Liberty Street, 35th Floor
New York, NY 10005
212−705−4884
Fax: 347−438−2199
Email: bmurray@fkks.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Craig B Whitney**
FRANKFURT BURNIT KLEIN & SELZ
PC
28 Liberty Street, 35th Floor
New York, NY 10005
212−705−4858
Fax: 347−438−2199
Email: cwhitney@fkks.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David J Fioccola**
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
212−336−4069
Email: dfioccola@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maura J Wogan**
FRANKFURT BURNIT KLEIN & SELZ
PC
28 Liberty Street, 35th Floor
New York, NY 10005
212−705−4858
Fax: 347−438−2199

Email: mwogan@fkks.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael B Miller**
Morrison & Foerster LLP
250 West 55th St.
New York, NY 10019
212–336–4069
Email: mbmiller@mofo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Bergstrom**
FRANKFURT BURNIT KLEIN & SELZ
PC
28 Liberty Street, 35th Floor
New York, NY 10005
212–705–4858
Fax: 347–438–2199
Email: nbergstrom@fkks.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Cerro Wire LLC**                    represented by    **Christopher James Renk**
ARNOLD & PORTER KAYE, SCHOLER
LLP
70 W Madison Street, Suite 4200
Chicago, IL 60602
312–583–2423
Fax: 312–583–2360
Email: chris.renk@arnoldporter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Joseph Harris**
ARNOLD & PORTER KAYE SCHOLER
LLP
70 W. Madison Street, Suite 4200
Chicago, IL 60602
312–583–2422
Fax: 312–583–2360
Email: michael.harris@arnoldporter.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard R Raleigh , Jr**
WOMBLE BOND DICKINSON (US)
LLP
125 Holmes Avenue Northwest
Huntsville, AL 35801
256–864–5551
Email: Richard.Raleigh@wbd–us.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher Lea Lockwood**

WOMBLE BOND DICKINSON (US)
LLP
125 Holmes Ave NW
Huntsville, AL 35801
256–864–5550
Email: chris.lockwood@wbd–us.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Encore Wire Corporation**

**Defendant**

**Southwire Company, LLC**

**Counter Claimant**

| | | |
|---|---|---|
| **Cerro Wire LLC** | represented by | **Christopher James Renk**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Joseph Harris**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Richard R Raleigh , Jr**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Christopher Lea Lockwood**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Copperweld Bimetallics, LLC** | represented by | **Alan D Mathis**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Benjamin Murray**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Craig B Whitney**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **David J Fioccola**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Maura J Wogan**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Michael B Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Bergstrom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/30/2021 | 1 | COMPLAINT with JURY DEMAND against Cerro Wire LLC filed by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A)(BJL) (Entered: 09/30/2021) |
| 09/30/2021 | 2 | NOTICE of Corporate Disclosure by Copperweld Bimetallics, LLC (BJL) (Entered: 09/30/2021) |
| 09/30/2021 | 3 | NOTICE OF CASE ASSIGNMENT to a United States Magistrate Judge for Trial. (BJL) (Entered: 09/30/2021) |
| 09/30/2021 | | Filing Fee: Filing fee $ 402, receipt_number 1126−3935395 (B4601116062). related document 1 COMPLAINT with JURY DEMAND against Cerro Wire LLC filed by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A)(BJL). (Mathis, Alan) Modified on 10/1/2021 (BJL). (Entered: 09/30/2021) |
| 09/30/2021 | 4 | Summons Issued as to Cerro Wire LLC by Clerk and given to Plaintiff for service. (BJL) (Entered: 10/01/2021) |
| 10/07/2021 | 5 | NOTICE by Copperweld Bimetallics, LLC *of Return on Service of Writ* (Mathis, Alan) (Entered: 10/07/2021) |
| 10/12/2021 | 6 | NOTICE of Appearance by Richard R Raleigh, Jr on behalf of Cerro Wire LLC (Raleigh, Richard) (Entered: 10/12/2021) |
| 10/12/2021 | 7 | NOTICE of Appearance by Christopher Lea Lockwood on behalf of Cerro Wire LLC (Lockwood, Christopher) (Entered: 10/12/2021) |
| 10/12/2021 | 8 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint Motion is **RIPE 10/12/2021**. Any party may file a motion to reconsider within three (3) business days of a ruling on the motion. Filed by Cerro Wire LLC. (Raleigh, Richard) (Entered: 10/12/2021) |
| 10/12/2021 | 9 | MOTION for Leave to Appear Pro Hac Vice Motion is **RIPE 10/12/2021**. Any party may file a motion to reconsider within three (3) business days of a ruling on the motion. Filed by Cerro Wire LLC. (Raleigh, Richard) (Entered: 10/12/2021) |
| 10/12/2021 | | PHV Fee paid: $ 75, receipt number 1126−3941410 (B4601116290). (Raleigh, Richard) Modified on 10/13/2021 (BJL). (Entered: 10/12/2021) |
| 10/13/2021 | 10 | TEXT ORDER granting 9 Motion for Leave to Appear pro hac vice. Signed by Magistrate Judge Herman N Johnson, Jr on October 13, 2021. (ADH) (Entered: 10/13/2021) |
| 10/13/2021 | 11 | ORDER granting 8 Motion for Extension of Time to Answer. Cerro Wire LLC answer due 11/24/2021.. Signed by Magistrate Judge Herman N Johnson, Jr on 10/13/21. (BJL) (Entered: 10/13/2021) |
| 10/13/2021 | 12 | MOTION for Leave to Appear Pro Hac Vice *(Christopher J. Renk)* Motion is **RIPE 10/13/2021**. Any party may file a motion to reconsider within three (3) business days of a ruling on the motion. Filed by Cerro Wire LLC. (Raleigh, Richard) (Entered: 10/13/2021) |
| 10/13/2021 | | PHV Fee paid: $ 75, receipt number 1126−3943005 (B4601116346). (Raleigh, Richard) Modified on 10/15/2021 (BJL). (Entered: 10/13/2021) |

| 10/14/2021 | 13 | TEXT ORDER granting 12 Motion for Leave to Appear pro hac vice. Signed by Magistrate Judge Herman N Johnson, Jr on October 14, 2021. (ADH) (Entered: 10/14/2021) |
|---|---|---|
| 10/14/2021 | 14 | NOTICE OF REASSIGNMENT: Case Reassigned to Judge Liles C Burke. Magistrate Judge Herman N Johnson, Jr no longer assigned to the case. Please use case number 5:21–cv–1310–LCB on all subsequent pleadings. (BJL) (Entered: 10/14/2021) |
| 10/14/2021 | 15 | INITIAL ORDER GOVERNING ALL FURTHER PROCEEDINGAS– with appendices attached. Signed by Judge Liles C Burke on 10/14/2021. (AHI) (Entered: 10/14/2021) |
| 10/14/2021 | 16 | Corporate Disclosure Statement by Cerro Wire LLC. filed by Cerro Wire LLC (Raleigh, Richard) (Entered: 10/14/2021) |
| 10/15/2021 | 17 | MOTION for Leave to Appear Pro Hac Vice *Nicole Bergstrom* by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A – Declaration, # 2 Certification, # 3 Certificate of Good Standing)(Mathis, Alan) (Entered: 10/15/2021) |
| 10/15/2021 | 18 | MOTION for Leave to Appear Pro *Benjamin G. Murray* by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A – Declaration, # 2 Certification, # 3 Certificate of Good Standing)(Mathis, Alan) (Entered: 10/15/2021) |
| 10/15/2021 | 19 | MOTION for Leave to Appear Pro Hac Vice *Craig B. Whitney* by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A – Declaration, # 2 Certification, # 3 Certificate of Good Standing)(Mathis, Alan) (Entered: 10/15/2021) |
| 10/15/2021 | 20 | MOTION for Leave to Appear Pro Hac Vice *Maura J. Wogan* by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A – Declaration, # 2 Certification, # 3 Certificate of Good Standing)(Mathis, Alan) (Entered: 10/15/2021) |
| 10/15/2021 | 21 | MOTION for Leave to File *Brief in Support of Motion for a Preliminary Injunction Exceeding Page Limit* by Copperweld Bimetallics, LLC. (Mathis, Alan) (Entered: 10/15/2021) |
| 10/15/2021 | 22 | MOTION for Preliminary Injunction by Copperweld Bimetallics, LLC. (Attachments: # 1 Declaration of Sarah Butler, # 2 Declaration of Thomas J. D'Agostino, P.E., # 3 Declaration of Mark W. Earley, P.E., # 4 Declaration of Peter Graser, # 5 Declaration of Craig B. Whitney)(Mathis, Alan) Modified on 10/18/2021 (AHI). (Entered: 10/15/2021) |
| 10/15/2021 | 23 | Brief is support of 22 MOTION for Preliminary Injunction filed by Copperweld Bimetallics, LLC. (Mathis, Alan) Modified on 10/18/2021 (AHI). (Entered: 10/15/2021) |
| 10/18/2021 | 24 | TEXT ORDER – For good cause shown, 21 Plaintiff's motion for leave to exceed page limit is GRANTED. Plaintiff's brief in support of its motion for preliminary injunction shall not exceed twenty–five pages. Signed by Judge Liles C Burke on 10/18/2021. (AHI) (Entered: 10/18/2021) |
| 10/20/2021 | | PHV Fee paid: $ 75, receipt number 1126–3946678 (B4601116455). (Mathis, Alan) Modified on 10/21/2021 (AHI). (Entered: 10/20/2021) |
| 10/20/2021 | | PHV Fee paid: $ 75, receipt number 1126–3946683 (B4601116456). (Mathis, Alan) Modified on 10/21/2021 (AHI). (Entered: 10/20/2021) |
| 10/20/2021 | | PHV Fee paid: $ 75, receipt number 1126–3946690 (B4601116457). (Mathis, Alan) Modified on 10/21/2021 (AHI). (Entered: 10/20/2021) |
| 10/20/2021 | | PHV Fee paid: $ 75, receipt number 1126–3946692 (B4601116458). (Mathis, Alan) Modified on 10/21/2021 (AHI). (Entered: 10/20/2021) |
| 10/20/2021 | 25 | TEXT ORDER – Upon consideration of Plaintiffs motions for leave to appear pro hac vice (Docs. 17, 18, 19 & 20), and their supporting exhibits, it is ORDERED that the motions are GRANTED. Signed by Judge Liles C Burke on 10/20/2021. (AHI) (Entered: 10/20/2021) |
| 10/29/2021 | 26 | Joint MOTION Scheduling Order by Cerro Wire LLC. (Attachments: # 1 Text of Proposed Order Proposed Scheduling Order)(Raleigh, Richard) (Entered: 10/29/2021) |

| 11/02/2021 | 27 | ORDER – The Court GRANTS the 26 Joint MOTION Scheduling Order and this action is set for a Hearing on the Motion for Preliminary Injunction on 2/15/2022 at 01:30 PM in Federal Courthouse, Huntsville, AL, as more fully set out in order. Signed by Judge Liles C Burke on 11/2/2021. (AHI) (Entered: 11/02/2021) |
|---|---|---|
| 11/08/2021 | 28 | Joint MOTION for Protective Order by Cerro Wire LLC. (Attachments: # 1 Text of Proposed Order Proposed Protective Order)(Raleigh, Richard) (Entered: 11/08/2021) |
| 11/09/2021 | 29 | PROTECTIVE ORDER – The Court GRANTS the 28 Joint Motion for Protective Order and certain documents and information shall remain confidential as set out in this order. Signed by Judge Liles C Burke on 11/9/2021. (AHI) (Entered: 11/09/2021) |
| 11/09/2021 | 30 | MOTION to Stay *or Extend Deadlines Under Rule 26 and Court's Initial Order Governing All Further Proceedings*, MOTION for Extension of Time by Cerro Wire LLC. (Raleigh, Richard) (Entered: 11/09/2021) |
| 11/12/2021 | 31 | TEXT ORDER – For good cause shown, the parties' joint motion (Doc. 30) is GRANTED. The parties' deadlines under the Court's initial order and Rule 26(f) are STAYED pending disposition of Plaintiff's motion for preliminary injunction. Signed by Judge Liles C Burke on 11/12/2021. (AHI) (Entered: 11/12/2021) |
| 11/23/2021 | 32 | Joint MOTION to Amend/Correct *Joint Motion for Entry of an Amended Scheduling Order* by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit 1 – Proposed Amended Scheduling Order)(Mathis, Alan) (Entered: 11/23/2021) |
| 11/30/2021 | 33 | ORDER – The Court GRANTS the Parties' Joint 32 Motion for Entry of an Amended Scheduling Order and certain time limits and deadlines apply as set out in this order. Signed by Judge Liles C Burke on 11/30/2021. (AHI) (Entered: 11/30/2021) |
| 12/30/2021 | 34 | **RECUSAL ORDER**: The undersigned hereby recuses from this action and **DIRECTS** the clerk to reassign this action to another judge. Signed by Judge Liles C Burke on 12/30/2021. (AHI) (Entered: 12/30/2021) |
| 12/30/2021 | 35 | **NOTICE OF REASSIGNMENT** This action is **REASSIGNED** Judge Madeline Hughes Haikala. Judge Liles C Burke is no longer assigned to the case. Please use case number **5:21–cv–1310–MHH** on subsequent pleadings (AHI) (Entered: 12/30/2021) |
| 01/04/2022 | 36 | **HAIKALA CHAMBERS INITIAL ORDER**. Signed by Judge Madeline Hughes Haikala on 1/4/2022. (KEK) (Entered: 01/04/2022) |
| 01/04/2022 | 37 | TEXT ORDER: Before the Court is the plaintiff's motion for a preliminary injunction. (Doc. 22 ). The Court sets this matter for a telephone conference at 11:00 a.m. CST on January 5, 2022. Counsel of record shall please dial 877–873–8018 and enter access code 5313999 to participate in the call. Signed by Judge Madeline Hughes Haikala on 1/4/2022. (KEK) (Entered: 01/04/2022) |
| 01/05/2022 | | Minute Entry for proceedings held before Judge Madeline Hughes Haikala: Telephone Conference held on 1/5/2022. (Court Reporter Teresa Roberson.) (YMB) (Entered: 01/06/2022) |
| 01/06/2022 | 38 | TEXT ORDER: The Court sets this matter for **hearing regarding plaintiff's 22 Motion for Permanent Injunction at 1:30 PM on Tuesday, 4/19/2022**, CR 7B, Hugo L Black US Courthouse, Birmingham, AL. Signed by Judge Madeline Hughes Haikala on 1/6/2022. (YMB) (Entered: 01/06/2022) |
| 01/26/2022 | 39 | NOTICE by Copperweld Bimetallics, LLC *Joint Notice of Intention to Amend Complaint* (Mathis, Alan) (Entered: 01/26/2022) |
| 01/26/2022 | 40 | Joint MOTION for Entry of Order to Resolve Plaintiff's Motion for a Preliminary Injunction by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit 1 – Proposed Order)(Mathis, Alan) (Entered: 01/26/2022) |
| 01/27/2022 | 41 | ORDER – The parties have asked the Court to enter an order to resolve plaintiff Copperweld's motion for a preliminary injunction. The hearing scheduled for April 19, 2022 (Doc. 38 ) is canceled. Signed by Judge Madeline Hughes Haikala on 1/27/2022. (KEK) (Entered: 01/27/2022) |
| 02/09/2022 | 42 | AMENDED COMPLAINT *First Amended Complaint* against Cerro Wire LLC, filed by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A – FAQs)(Mathis, Alan) |

| | | |
|---|---|---|
| | | (Entered: 02/09/2022) |
| 02/10/2022 | 43 | NOTICE by Copperweld Bimetallics, LLC re 42 Amended Complaint *of Plaintiff's Notice of Filing Under Seal* (Mathis, Alan) (Entered: 02/10/2022) |
| 02/14/2022 | 44 | ***Document Sealed – Unredacted First Amended Complaint filed by Copperweld Bimetallics, LLC. (KEK) (Entered: 02/14/2022) |
| 02/14/2022 | 45 | REPORT of Rule 26(f) Planning Meeting. (Whitney, Craig) (Entered: 02/14/2022) |
| 02/15/2022 | 46 | **SCHEDULING ORDER**: Discovery due by 11/14/2022. Dispositive motions due by 1/13/2023. Status Conference set for Monday, 11/14/2022 at 11:00 AM, CR 7B, Hugo L Black US Courthouse, Birmingham, AL. See Order for other deadlines and directives. Signed by Judge Madeline Hughes Haikala on 2/15/2022. (YMB) (Entered: 02/15/2022) |
| 02/23/2022 | 47 | *Defendant's* ANSWER to 42 Amended Complaint by Cerro Wire LLC.(Raleigh, Richard) (Entered: 02/23/2022) |
| 07/15/2022 | 48 | MOTION Joint Motion for Leave to File Amended or Supplemental Pleadings & for Entry of a First Amended Scheduling Order by Cerro Wire LLC. (Attachments: # 1 Exhibit Proposed First Amended Scheduling Order)(Raleigh, Richard) (Entered: 07/15/2022) |
| 07/20/2022 | 49 | MOTION for Leave to File *A Supplemental Pleading Asserting Counterclaims Against Copperweld Bimetallics, LLC* by Cerro Wire LLC. (Attachments: # 1 Exhibit Cerro Wire, LLC's Counterclaims Against Copperweld Bimetallics, LLC, # 2 Exhibit Ex. B PART 1– Copperweld–Building Wire–Builders Presentation, # 3 Exhibit Ex. B PART 2– Copperweld–Building Wire–Builders Presentation, # 4 Exhibit Ex. B– PART 3– Copperweld–Building Wire–Builders Presentation, # 5 Ex. C – Does Copper–Clad Aluminum Building Wire)(Raleigh, Richard) (Entered: 07/20/2022) |
| 08/10/2022 | 50 | MOTION Plaintiff's Motion for Status Conference by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit A)(Mathis, Alan) (Entered: 08/10/2022) |
| 08/11/2022 | 51 | **TEXT ORDER**: The Court **GRANTS 50 Plaintiff's Motion for Status Conference. Status Conference is SET for 8/22/2022 at 10:30 AM in Courtroom 7B of the Hugo L Black US Courthouse, Birmingham, AL before Judge Madeline Hughes Haikala. Signed by Judge Madeline Hughes Haikala on 8/11/2022. (DNW) (Entered: 08/11/2022)** |
| 08/19/2022 | 52 | MOTION for Leave to Appear Pro Hac Vice *David J. Fioccola* by Copperweld Bimetallics, LLC. (Mathis, Alan) (Entered: 08/19/2022) |
| 08/19/2022 | 53 | MOTION for Leave to Appear Pro Hac Vice *Michael B. Miller* by Copperweld Bimetallics, LLC. (Mathis, Alan) (Entered: 08/19/2022) |
| 08/22/2022 | | PHV Fee paid: $75, receipt number B–741 for David J. Fioccola (KAM) (Entered: 08/22/2022) |
| 08/22/2022 | | PHV Fee paid: $75, receipt number B– 742 for Michael B. Miller (KAM) (Entered: 08/22/2022) |
| 08/22/2022 | | Minute Entry for proceedings held before Judge Madeline Hughes Haikala: Status Conference re Joint Motion To Amended Pleadings held on 8/22/2022. Counsels for plaintiff present. Counsel for defendant present. Court to grant joint motion to amend. Order to follow. (Court Reporter Leah Turner.) (DNW) (Entered: 08/22/2022) |
| 08/22/2022 | 54 | **TEXT ORDER**: The Court **GRANTS 52 , 53** Motion for Leave to Appear Pro Hac Vice. The court admits Attorney David J. Fioccola and Attorney Michael B. Miller as co–counsel for Plaintiff. Signed by Judge Madeline Hughes Haikala on 8/22/2022. (DNW) (Entered: 08/22/2022) |
| 08/22/2022 | 55 | ORDER granting 48 Motion. Consistent with the discussion on the record during the August 22, 2022 hearing in this matter, the Court grants the parties' joint motion to amend the pleadings in this case. Copperweld shall file its second amended complaint no later than August 23, 2022. Signed by Judge Madeline Hughes Haikala on August 22, 2022. (Haikala, Madeline) (Entered: 08/22/2022) |

| 08/22/2022 | 56 | ORDER granting 49 Motion for Leave to File. Consistent with the discussion on the record during the August 22, 2022 hearing in this matter, Cerro may file its amended response to Copperweld's first amended complaint. No later than August 23, 2022, Cerro shall file as a supplement to its answer to the first amended complaint its counterclaims against Copperweld. Signed by Judge Madeline Hughes Haikala on August 22, 2022. (Haikala, Madeline) (Entered: 08/22/2022) |
|---|---|---|
| 08/22/2022 | 57 | COUNTERCLAIM *as Supplement to Answer to First Amended Complaint* against Copperweld Bimetallics, LLC, filed by Cerro Wire LLC. (Attachments: # 1 Exhibit Exhibit B– Builder Presentation, # 2 Exhibit Exhibit C– Article)(Raleigh, Richard) (Entered: 08/22/2022) |
| 08/23/2022 | 58 | Transcript of Proceedings held on August 22, 2022, before Judge Madeline Hughes Haikala. Court Reporter/Transcriber Leah S. Turner. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <span style="color:red">NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days.</span> (A copy can be obtained at http://www.alnd.uscourts.gov/local/court%20forms/transcripts/Transcript%20Redaction%20Policy.pdf) See Transcript Redaction Policy Redaction Request due 9/13/2022. Redacted Transcript Deadline set for 9/23/2022. Release of Transcript Restriction set for 11/21/2022. (KAM) (Entered: 08/23/2022) |
| 08/23/2022 | 59 | MOTION to Seal *Plaintiff's Motion for Leave to File under Seal Pursuant to Protective Order* by Copperweld Bimetallics, LLC. (Mathis, Alan) (Entered: 08/23/2022) |
| 08/23/2022 | 60 | AMENDED COMPLAINT *Second Amended Complaint* against Cerro Wire LLC, Encore Wire Corporation, Southwire Company, LLC, filed by Copperweld Bimetallics, LLC. (Attachments: # 1 Exhibit Exhibit A)(Mathis, Alan) (Entered: 08/23/2022) |
| 08/29/2022 | 61 | TEXT ORDER: The Court GRANTS 59 Plaintiff's Motion to File Under Seal. Signed by Judge Madeline Hughes Haikala on 8/29/2022. (DNW) (Entered: 08/29/2022) |
| 08/31/2022 | 63 | Summons Issued by the clerk and delivered to plaintiff for service as to Encore Wire Corporation. (AHI) (Entered: 09/01/2022) |
| 09/01/2022 | 62 | ***Document Sealed pursuant to order. (Attachments: # 1 2nd Amended Complaint) (DNW) (Entered: 09/01/2022) |
| 09/01/2022 | 64 | Summons Issued by the clerk and delivered to plaintiff for service as to Southwire Company, LLC. (AHI) (Entered: 09/02/2022) |
| 09/02/2022 | 65 | Joint MOTION for Extension of Time *to Respond to Second Amended Complaint and Counterclaims* by Cerro Wire LLC. (Harris, Michael) (Entered: 09/02/2022) |
| 09/02/2022 | 66 | Alias Summons Issued by the clerk and delivered to plaintiff for service as to Southwire Company, LLC. (AHI) (Entered: 09/06/2022) |
| 09/06/2022 | 67 | **TEXT ORDER**: The Court GRANTS 65 Joint Motion for Extension of Time. Copperweld and Cerro Wire shall file a response to the Counterclaims and the Second Amended Complaint on or before October 14, 2022. Signed by Judge Madeline Hughes Haikala on 9/6/2022. (DNW) (Entered: 09/06/2022) |
| 09/06/2022 | 68 | NOTICE by Copperweld Bimetallics, LLC re 66 Alias Summons Issued *of Return on Service of Writ* (Mathis, Alan) (Entered: 09/06/2022) |
| 09/07/2022 | 69 | NOTICE of Change of Address by Richard R Raleigh, Jr (Raleigh, Richard) (Entered: 09/07/2022) |
| 09/08/2022 | 70 | NOTICE by Copperweld Bimetallics, LLC re 63 Summons Issued *of Proof of Service* (Mathis, Alan) (Entered: 09/08/2022) |
| 09/26/2022 | 71 | Joint MOTION for Extension of Time *for Defendants to Respond to Plaintiff's Second Amended Complaint and Plaintiff to Respond to Defendant Cerro Wire, LLC's Counterclaims* by Copperweld Bimetallics, LLC. (Mathis, Alan) (Entered: 09/26/2022) |

| 09/27/2022 | 72 | ORDER granting <u>71</u> Motion for Extension of Time. The Court grants the parties' joint motion for extension of time. (Doc. <u>71</u> ). The parties shall file their respective responses on or before November 1, 2022. Signed by Judge Madeline Hughes Haikala on September 27, 2022. (Haikala, Madeline) (Entered: 09/27/2022) |

# Exhibit B



iMessage
Wed, Aug 10, 10:55 PM

Proposed Second...

Rich,

Please see attached a proposed amended complaint that we have submitted related to our case with Cerro.

I wanted to attempt to be the first you have heard from on this matter.

I would like to speak with you about our position and desire for a resolution with Southwire.
I am available via phone tomorrow / Thursday before 12PM EST.
I can be available anytime Friday.
I am fine for us not to have legal counsel on the call.

Best Regards,
Craig York

Thu, Aug 11, 5:43 PM

Rich,

Thu, Aug 11, 5:43 PM

Rich,

Apologies for missing your call. I am available anytime this evening or tomorrow.
Let me know a time you can connect and I will call you or you can call me.

Best,
Craig

Delivered

Thu, Aug 11, 9:43 PM

Craig, I will call

# Exhibit C

```
1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ALABAMA
2                        NORTHEASTERN DIVISION

3

4    COPPERWELD BIMETALLICS, LLC,  *

5             Plaintiff,          *      5:21-cv-01310-MHH

6        vs.                      *      August 22, 2022
                                         10:30 a.m.
7    CERRO WIRE, LLC,             *
                                         Birmingham, Alabama
8             Defendant.          *

9
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10
                      TRANSCRIPT OF HEARING
11       BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
                 UNITED STATES DISTRICT JUDGE
12
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
13

14   For the Plaintiff:   Nicole Bergstrom
                          Maura J. Wogan
15                        FRANKFURT BURNIT KLEIN & SELZ, PC

16                        Alan D. Mathis
                          BUTLER SNOW, LLP
17
                          David J. Fioccola
18                        MORRISON & FOERSTER, LLP

19

20   For the Defendant:   Richard R. Raleigh, Jr.
                          WILMER & LEE, PA
21

22
     Court Reporter:      Leah S. Turner, RMR, CRR
23                        Federal Official Court Reporter

24

25
```

1          This cause came to be heard and was heard on the
22nd day of August 2022, before the Honorable Madeline Hughes
2    Haikala, United States District Judge, holding court for
United States District Court, Northern District of Alabama,
3    Northeastern Division, in Birmingham, Alabama.

4          Proceedings continued as follows:

5               P R O C E E D I N G S

6          (COURT CALLED TO ORDER.)

7          THE COURT:  We are here today in case 21-1310.  This

8    is Copperweld versus Cerro.  We are here for a status

9    conference in this case.  The Court recognizes that it also

10   has a discovery matter, a miscellaneous discovery matter,

11   regarding a nonparty subpoena for discovery.

12         Let me start, please:  The Court has pending before

13   it a joint motion for the parties to amend their pleadings.

14   The Court also has received from Cerro a proposed amended

15   answer and amended counterclaim.

16         I haven't, I believe, received anything yet from

17   Copperweld, although Copperweld had indicated that it wished

18   to file an amended complaint.  Is that right?

19         MR. RALEIGH:  I believe that's correct.

20         MS. BERGSTROM:  Actually, Your Honor, we filed a

21   proposed amended complaint, second amended complaint, on

22   August 10th as an exhibit to our request for a conference.

23         THE COURT:  I overlooked it.  I apologize.

24         MS. BERGSTROM:  Not a problem.

25         THE COURT:  Can you give me a document number,

1    please?  I'm still not seeing it.

2          MR. RALEIGH:  Your Honor, I think it was –– 50–1, an

3    attachment to their motion for a status conference.

4          THE COURT:  I see.  Thank you.

5          All right.  Tell me a little bit, please, about the

6    proposed second amended complaint and the effort to add new

7    parties to the action, please.

8          MS. BERGSTROM:  Your Honor, this is a false

9    advertising claim brought by Copperweld, a CCA manufacturer,

10   against Cerro, a copper wire manufacturer.  They are

11   competitors in the industry.  The amendment would add an

12   antitrust claim against Cerro as well as two other copper

13   manufacturers, Southwire and Encore Wire.

14          The allegations are different.  They are different

15   claims, but they come from the same industry, the same general

16   efforts, we believe, to keep Copperweld, which is a relatively

17   new competitor, from fairly competing.

18          THE COURT:  Based on my reading of the motion to

19   quash, Encore already has a lawsuit pending in Texas that has

20   to do with these issues.  It's a declaratory judgment action;

21   is that correct?

22          MS. BERGSTROM:  Not quite, Your Honor.  Encore filed

23   in March a declaratory judgment action seeking a determination

24   that they did not commit false advertising, separate

25   advertising from Cerro.  It's based on the podcast and

1    supporting materials that Encore was putting out and sending

2    to clients and potential customers.  It's a separate action.

3         We filed our motion for leave to amend on the 15th.

4    It was a joint motion.  We filed our amended complaint as a

5    supplement after the antitrust claim.  Encore then filed a

6    motion to amend their own claims to add a declaratory judgment

7    claim that they did not commit antitrust.  So that is now

8    pending as a motion to amend, but the case in Texas has been

9    also a false advertising case.

10         THE COURT:  Mr. Raleigh, was there something you

11   wanted to say?

12         MR. RALEIGH:  Yes, Your Honor, if they have answered

13   all the Court's questions.

14         THE COURT:  I will hear from you.  Go ahead.

15         MR. RALEIGH:  Your Honor is correct.  Cerro filed an

16   amended pleading, a motion for leave to amend.  We had both

17   filed a joint motion to extend the deadline for that.  We

18   actually filed before the original deadline.

19         To date, Copperweld hasn't filed either a motion for

20   leave to amend or an amended pleading.  I think in the motion

21   for a status conference, they called the second amended

22   complaint in draft form, but we don't back away from the

23   original ask that the Court extend the deadline.

24         I do think the Court has hit on something

25   significant, though.  In the joint motion to extend this

1   deadline, Copperweld suggested that they would be amending to

2   add claims against Cerro.  They did not suggest they would add

3   claims against others.  And these antitrust claims they

4   suggest adding against Cerro are about activities that even in

5   the original complaint are discussed back in 2019, this panel

6   discussion thing.

7           I mean, we can deal with that in response to a

8   second amended complaint, but there is both a claim in Texas

9   with Encore and one in the Northern District of Georgia with

10  Southwire.  Both are declaratory judgment actions, and as

11  counsel suggested, there has been leave to amend the Texas

12  case to add a request to declare that this antitrust stuff is

13  wrong, to declare that there is no antitrust violation related

14  to Encore.

15          So that would be a first-filed case, as would the

16  Northern District of Georgia because there has been no

17  amendment here.  But those really deal with Encore and

18  Southwire, and I will let them carry the water on that.

19          All of this, even adding an antitrust claim against

20  Cerro, would significantly increase the scope of this

21  litigation and discovery.  So it's within the Court's

22  discretion to allow amendments.  We agree we have asked for

23  more time for both of the parties to amend their pleadings.

24  If the Court were to do that, we would suggest that we would

25  need a lot more time and to give the parties time to discuss

1   an update to the scheduling.

2          MS. BERGSTROM:  Your Honor, if I can just correct a

3   couple of issues.  Encore's declaratory judgment is still at

4   the motion for leave to amend stage.  They have filed a

5   proposed amended pleading per the local rule there that is not

6   an active pleading.  The motion stands.  We will be opposing

7   it.  So those are both second-filed actions.  They are filed

8   after our own leave to amend.

9          But that's not really here nor there.  We are happy

10  to work with the new parties on the schedule.  We timely filed

11  a joint motion to amend.  We actually have offered at that

12  point to give Cerro a copy of our proposed complaint and to

13  see theirs.  Instead, they drafted the joint motion.  They

14  declined to see it.

15         We have been attempting to be forthright, but,

16  candidly, we weren't sure that we would add the additional

17  parties until we filed our proposed amended pleading on

18  August 10th given that these activities are actually ongoing.

19  This relates to an effort to add a new product to the National

20  Electrical Code, a new wire and gauge.  That effort continues.

21  There is an appeal pending informally at the NEC, National

22  Electrical Code, by our client, and that appeal was only heard

23  on August 10.

24         So these are new issues that have been arising and

25  continuing through the process of this case, but we do think

1  they are related and we are still at the beginning of

2  discovery.  We have not finished Cerro's production.  We still

3  have not had a single deposition.  We agree that it would

4  require some tweaks to the schedule and additional time, and

5  we are happy to work with all defendants on that, but we think

6  there's still time in this action where we already have

7  Copperweld and Cerro at a general base of discovery that shows

8  testing information related to this product, communications

9  related to this process that would be applicable here, and it

10 makes sense to have the action added to this one.

11         THE COURT:  So tell me what discovery you all have

12 done in this case so far to date, please.

13         MS. BERGSTROM:  We did a bit of prediscovery before

14 issuing document requests.  As Your Honor may remember, there

15 was a motion for a preliminary injunction that was resolved

16 after a bit of discovery.  In that process, we got some

17 discovery not only on the distribution and drafting of the

18 FAQs, which are the heart of our false advertising action, but

19 also testing of CCA performed by Cerro and we understand

20 Encore and Southwire as well that were done around the code

21 process.  So some of that formative discovery has already been

22 done in this case and would be applicable to both.

23         We agree there would be additional discovery

24 necessary to add an antitrust claim, but there is that basis

25 there and we are still early in the process.

1      THE COURT:  And have any depositions been taken?

2      MS. BERGSTROM:  They have not.  Not a single one has

3  been noticed.  In fact, we have a deadline now that would

4  likely have to be extended a bit.  It's a September deadline

5  for party depositions.  Cerro's discovery is not yet complete,

6  so I doubt we would be able to make that anyway, so

7  I anticipate we will need some extension of the schedule;

8  candidly more if there is an antitrust claim added.

9      THE COURT:  Mr. Raleigh, did you want to add

10  anything to that?

11      MR. RALEIGH:  Everything she says is correct.  They

12  have been forthright.  We did discuss the joint motion and

13  that was fine.  I don't think I misled the Court by suggesting

14  that Encore has filed their motion for leave to amend.

15  Copperweld here did not file the motion for leave to amend,

16  though.  Again, that's Encore and Southwire and they can deal

17  with that if they get pulled into this thing.

18      But she is right, it will -- we are already at a

19  place where we've got to extend discovery and other deadlines.

20      THE COURT:  I understand that.  I'm trying to figure

21  out what the posture of the case should be and give you all an

22  efficient way to move forward.

23      I assume that if the Court allows the plaintiff to

24  file the second amended complaint, that Cerro may wish to look

25  at that and consider whether it wants to move forward with the

1    proposed answer and counterclaim it had submitted or whether

2    it wants to file a new answer and counterclaim to the second

3    amended complaint.  Is that fair to anticipate, Mr. Raleigh?

4        MR. RALEIGH:  Your Honor, that's correct.  Well, we

5    are fine -- if the Court is inclined to grant our motion for

6    leave to amend and just attach the admitted answer with

7    counterclaim, I think that would work fine.  Obviously, if

8    they amend to add another claim, we would have to answer that,

9    and that's what we would do.

10        THE COURT:  Okay.

11        MR. RALEIGH:  I think it would result in some motion

12    practice by Encore and Southwire.

13        THE COURT:  That's one of the things I wanted to

14    ask.  Ms. Bergstrom, with respect to your proposed second

15    amended complaint, one of the things I have to think about is

16    whether it would be futile, correct?

17        MS. BERGSTROM:  That's correct, Your Honor.

18        THE COURT:  I wonder whether there are going to be

19    personal jurisdiction issues with the defendants that you

20    propose adding to this action.  Have you given that some

21    thought?

22        MS. BERGSTROM:  We have, and I'll invite my

23    colleague, David Fioccola of Morrison & Foerster, who has come

24    in to assist us with the antitrust claim, to pipe up.

25        But my understanding is that the antitrust claim

1    brings with it a nationwide jurisdiction, and both Southwire

2    and Encore have been contacts in this state.  Southwire, I

3    believe, has two manufacturing plants.  Encore regularly sells

4    its wire products in the state.  We do believe there would be

5    personal jurisdiction, and we have alleged as much in the

6    proposed second amended complaint.

7            THE COURT:  Anything you want to add?

8            MR. FIOCCOLA:  Your Honor, that's exactly right.

9    Those are the relevant facts, whether you apply nationwide

10   jurisdiction under Section 12 of the Clayton Act.  You could

11   also apply minimal contacts analysis under the long arm

12   statute of this state, in which case it would be relevant

13   factors.  You could also look at the fact that the allegations

14   are conspiracy among these three potential defendants with

15   communications happening over Teams, Zoom, and email taking

16   place in this jurisdiction.

17           So I think under the three jurisdictional paths the

18   Court can take, you can probably check the box for each of

19   those three, whether it's nationwide under the Clayton Act,

20   the long arm statute, or looking at coconspirator jurisdiction

21   because at least one of the coconspirators engaged in unlawful

22   antitrust activities in the state.

23           THE COURT:  Thank you.  And then is it anticipated

24   that the goal would be to have all of this litigation proceed

25   in a forum as opposed to being litigated in three separate

1    forums?

2        MS. BERGSTROM:  That would certainly be our goal and

3    we think it makes sense and is the most efficient way to move

4    forward.  Given the pending case against Cerro, we think it

5    makes sense to have it here, given that we have some discovery

6    and we have, we believe, jurisdiction here.  We would be

7    moving to dismiss or to transfer, consolidate the other

8    actions to this court.

9        THE COURT:  How much money is at issue?

10        MS. BERGSTROM:  On both claims, Your Honor?

11        THE COURT:  Yes, on everything.

12        MS. BERGSTROM:  We are still working with our

13    damages experts to calculate.  I think it would be --

14        THE COURT:  Give me a sense, though.  $5?  No?

15        MS. BERGSTROM:  Much more than $5.  For the

16    antitrust side, it's an entire new wire and gauge that could

17    be introduced to the market.  That's difficult to calculate,

18    but it is quite lucrative, given the price of wire and

19    building.  And even on the FAQs, we have significant clients

20    who were sent these FAQs and thereafter chose not to buy.  So

21    again, while we are still working through discovery and hoping

22    to get a bit more information and work with our damages

23    expert, I think it will be significant damages.

24        MR. FIOCCOLA:  And I would just amend that to say

25    that the damages under the antitrust laws are treble and also

1    attorney's fees.  So you're already starting with a

2    substantial amount times three, plus attorney's fees.

3              THE COURT:  Mr. Raleigh?

4              MR. RALEIGH:  I guess as the Court can imagine, we

5    deny all of these claims.  The panel discussions they are

6    talking about are things that take place in this panel

7    decision-making process that I think has gone back for a

8    hundred years now.

9              But all parties are providing input.  Yes, this

10   continues.  At the moment, the panel has not approved the

11   change to allow this different gauge, either for Cerro or

12   Copperweld.

13             The claims heretofore have been really

14   pretty limited.  It is this Frequently Asked Questions form

15   that we all agreed, holding aside all of our defenses and

16   arguments, that we wouldn't distribute anymore.  So it was a

17   very -- as the Court will recall, it was a very short period

18   of time that that took place.

19             So if this becomes an antitrust case nationwide,

20   it's going to increase by a great deal the scope of this

21   litigation.

22             THE COURT:  I'm asking all these questions because

23   my brain always goes to what is the most efficient way to

24   resolve a party's dispute, and I know sometimes the amount of

25   money at issue can greatly influence the extent to which a

1  dispute is a good candidate for some early discussion, but it

2  almost seems to me like there must be some industry experts

3  who could provide some really helpful discussions with the

4  parties to see if there's a way to resolve this early on as

5  opposed to what sounds like a very intensive bit of litigation

6  that surely will cost everyone a fair amount of money to

7  pursue.

8          Have you all -- I can't remember when we were

9  talking about the FAQ that was the subject of our early

10  discussions whether you all had tried to mediate at all or

11  whether the lawsuit was really the beginning of the effort to

12  resolve the parties dispute?

13          MS. BERGSTROM:  We have not yet tried to mediate.

14  We did in the context of a preliminary injunction motion

15  informally attempt to resolve the false advertising dispute.

16  I think we have a little bit too much unknown right now.  We

17  need to know whether we have our amendment, whether we have

18  the antitrust claims in play.

19          But, of course, we would be more than happy to have

20  early discussions about resolving that issue as well.

21          THE COURT:  With everyone?  With Encore and -- and

22  I'm sorry, what is the name of the other company?

23          MS. BERGSTROM:  Southwire.

24          THE COURT:  Southwire.  -- with all of the parties

25  whose names are involved now and in litigation in one form or

1    another?

2        MS. BERGSTROM:  Yes.  And, frankly, I think that

3    would make a bit more sense than having piecemeal litigations

4    in Georgia, here, and Texas to try to resolve separately.  To

5    get all the parties here for us makes it not only efficient to

6    litigate this case but efficient to potentially attempt to

7    settle this case.

8        THE COURT:  The Court is going to allow the second

9    amended complaint.  So if you all, please, formally file your

10   second amended complaint.  And then you will need to serve the

11   new defendants, please, and then I'll see what the response is

12   to the second amended complaint and we'll go from there.

13       Mr. Raleigh?

14       MR. RALEIGH:  Can you grant motion for leave to

15   amend and allow the filing of our amended answer?

16       THE COURT:  I'm happy to do that.  Again, I just

17   don't know whether that's a futile act because you are going

18   to have to respond anyway to the second amended complaint now,

19   and so your anticipated new counterclaims can just come in

20   with respect to the second amended complaint, I would think.

21   I'm happy to allow the answer and counterclaims, though, that

22   you proposed, if that's how you prefer to make the record.

23       MR. RALEIGH:  Thank you, Your Honor.

24       THE COURT:  And then we will obviously need new

25   scheduling deadlines.  It probably doesn't make sense to talk

1    about those yet.  We will see how everything unfolds.  I would

2    anticipate, though, that depending on the responses to the

3    second amended complaint and maybe even notwithstanding the

4    responses to the second amended complaint, that the Court will

5    encourage an opportunity for everyone to sit down, preferably

6    with someone who does understand the industry, and have a

7    constructive conversation to see if there's a way to resolve

8    this early on as opposed to getting in the weeds of all of

9    this litigation.

10        I'm sure it's extremely interesting, and we'll look

11   forward to working on it if that's where this takes us, but it

12   does seem that there may be an opportunity for the parties to

13   get together and see if they can't find some common ground to

14   save everyone a lot of time and expense.

15        What else should we discuss today, if anything?

16        MS. BERGSTROM:  That was the purpose of our

17   requesting the conference, Your Honor, just to talk about the

18   motion to amend the schedule.  So nothing more from

19   Copperweld.  But thank you.

20        MR. RALEIGH:  Nothing more from Cerro.  Thank you,

21   Your Honor.

22        THE COURT:  All right.  At some point I assume that

23   we will need to take up the motion to quash, but perhaps the

24   best thing to do is go ahead and get the second amended

25   complaint filed and see where that takes us with respect to

1    the new defendants and the new claims.

2            MS. BERGSTROM:  I think that's right, Your Honor.

3    With Encore becoming a defendant, it may change that motion.

4            THE COURT:  Correct.  Very good.  Thank you.  Take

5    care.  Have a good week.

6            (End of proceedings.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

    I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**

# Exhibit D

FILED

2022 Aug-23  PM 07:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

COPPERWELD BIMETALLICS, LLC,

      Plaintiff,

  v.

CERRO WIRE, LLC; ENCORE WIRE
CORPORATION; SOUTHWIRE
COMPANY, LLC

      Defendants.

Case No. 5:21-cv-01310-MHH

## SECOND AMENDED COMPLAINT

Plaintiff COPPERWELD BIMETALLICS, LLC ("Copperweld"), for its Second Amended Complaint against Defendants CERRO WIRE, LLC ("Cerro"); ENCORE WIRE CORPORATION ("Encore"); and SOUTHWIRE COMPANY, LLC states and alleges as follows:

## DESCRIPTION OF ACTION

1. This lawsuit began as an action arising from Cerro's false and misleading statements and unlawful and deceptive trade practices in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and common law. It has now become clear that Cerro has also engaged in an unlawful conspiracy with its two largest competitors—Encore and Southwire—to block Copperweld's proposal to add 14-gauge copper-clad aluminum (CCA) as a permissible branch circuit conductor in the 2023 edition of the National Electrical Code® ("NEC").

2.     The NEC is a model code, promulgated by the National Fire Protection Association (NFPA), which establishes minimum safety standards for electrical systems.  First published in 1897, the NEC is the most widely used and accepted standard for electrical installations in buildings and structures throughout the Americas.   The conspirators seek to prevent Copperweld from bringing an innovative new product to the residential electrical wire market—an innovation that would benefit consumers and the building industries, and increase competition all around.

3.     CCA wiring is an innovation in the residential electrical wiring industry long dominated by copper wiring.  Developed in the 1960s by scientists at Texas Instruments, the use of CCA has seen a resurgence in recent years due to the rising price of copper and increased demand for new residential housing.  CCA—by including copper cladding metallurgically bonded to an aluminum core—retains the strength and safety of traditional copper wiring, but at a significantly lower price. Indeed, following rigorous testing and analysis, CCA has been deemed safe and approved by the NEC and other relevant code-making bodies for fifty years for wires sized 12-gauge and up.

4.     Thanks to the proliferation of LED lighting and other advances in energy-efficient technology, the electrical load required to light a house is just a

2

fraction of what it used to be. This has opened up new demand and use cases for less-powerful lighting circuits, which can safely be used with smaller wires.

5.     Since 2017, Copperweld has sought to bring smaller CCA wires to market to serve this new demand in residential construction. These smaller, size 14-gauge CCA wires are attractive to consumers because they cost less, promote energy efficiency, and help conserve copper, a society-critical resource.

6.     Copperweld is currently the only seller of CCA wire—in any size—for residential buildings in the United States. Copperweld has continually manufactured CCA as a conductor material since the early 1970s for use in data cables, an industry where CCA has been an economic alternative continually since its invention.

7.     Copper wire makers are feeling threatened by a new competitor encroaching on their share of the residential wire market. To combat the growing threat of CCA, Cerro, a manufacturer of copper wiring, embarked on a multi-part anticompetitive scheme that involved: (1) conspiring with Encore and Southwire to keep 14-gauge CCA out of the next edition of the NEC, and taking other steps to effectively block it from the market; and (2) introducing a deceptive marketing campaign against CCA more generally in order to unfairly compete with Copperweld's lower prices, and, ultimately, to drive Copperweld out of the market.

8.     Starting in the spring of 2020, Cerro began colluding with Encore and Southwire to prevent the inclusion of Copperweld's 14-gauge CCA in the next

edition of the NEC, the 2023 edition. The NFPA updates the NEC every three years through a multi-step process led by various code-making panels (CMPs) comprised of representatives from manufacturers, inspectors, electricians, testing labs, and other stakeholders. The 14-gauge CCA proposal was directed to the NFPA's NEC CMP-6, which initially accepted it by a landslide.

9. This victory prompted Cerro, Encore and Southwire—which all have representatives on CMP-6—to take swift, coordinated, anticompetitive action to block Copperweld's efforts to add 14-gauge CCA by subverting the NEC code-making process. In particular, Cerro, Encore, and Southwire agreed to conduct several virtually-identical, unscientific, and deliberately-flawed studies that they knew would confuse their fellow panel members into falsely believing that 14-gauge CCA was unsafe. These sham studies were self-designed, and explicitly based on an earlier test Cerro's representative had run at home in her garage. The format and substance of the studies were unscientific and idiosyncratic, rendering it implausible that they could have been structured unilaterally as opposed to pursuant to an agreement. They were also successful, their mere existence causing decision-makers on CMP-6 to withdraw their support for the 14-gauge CCA proposal, leading to its exclusion from the 2023 NEC.

10. Outside the NEC code-making process, Cerro turned to Copperweld's customers and/or potential customers, surreptitiously distributing a "Copper Clad

Aluminum FAQs" document (the "FAQs") that falsely claimed that CCA shared the dangers of aluminum wire from the 1970s. While single-metal aluminum wiring, which had gained popularity many decades ago, is now generally deemed unsafe for use in residential homes, CCA bears none of the risks of that older material.

11.     Cerro's conspiracy and commercial distribution to consumers of the FAQs containing false and misleading statements about Copperweld's product have damaged Copperweld, and its continued distribution of the FAQs threatens to further harm Copperweld at a particularly crucial time for the industry. Upon information and belief, Cerro Wire has acted intentionally to deceive the consuming public and injure Copperweld.

12.     Through their conspiracy, Defendants have also succeeded in blocking 14-gauge CCA from the 2023 edition of the NEC, allowing Cerro, Encore, and Southwire to maintain artificially high prices for its single-metal copper wire, injuring consumers and competition in the residential electrical wire market throughout the country.

## THE PARTIES

13.     Copperweld is a Delaware limited liability company with its principal place of business in Brentwood, Tennessee. Copperweld is the leading supplier and only domestic producer of CCA electrical wiring/conductors in the United States.

14.    Cerro is a Delaware limited liability company with its principal place of business in Hartselle, Alabama.  Cerro is a manufacturer and supplier of copper electrical wiring and a direct competitor of Copperweld in residential electrical wire.

15.    Encore is a Delaware corporation with its principal place of business in McKinney, Texas.  Encore is a manufacturer and supplier of copper electrical wiring and a direct competitor of Copperweld in residential electrical wire.

16.    Southwire is a Delaware corporation with its principal place of business in Carrollton, Georgia.  Southwire is a manufacturer and supplier of copper electrical wiring and a direct competitor of Copperweld in residential electrical wire.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 15 U.S.C. § 1121 (Lanham Act claims), 15 U.S.C. §§ 1, 15, 26 (Sherman Act claims), and 28 U.S.C. § 1367 (supplemental jurisdiction over pendant state law claims).

18.    This Court has personal jurisdiction over Cerro because Cerro is a citizen of Alabama with its principal place of business is in Hartselle, Alabama. Copperweld is further informed and believes that Cerro's wrongful conduct originated and/or was directed from this principal place of business.

19.    This Court has personal jurisdiction over Encore and Southwire because they each have minimum contacts with this district; they each conspired

6

with Cerro, which resides in this district, to harm and actually did harm Copperweld, as explained in detail throughout this complaint, and overt acts of the conspiracy took place within this district.

20.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 because all defendants can be found in this district.  Cerro resides in the district. Southwire is registered to do business in Alabama, and at least two of its manufacturing plants are located in this district.  Encore likewise transacts business in this state, and directs customers located in Alabama via its website to a local sales representative responsible for the state.  Venue is also proper pursuant to 28 U.S.C. §§ 1391 because Cerro resides in this district and a substantial part of the events giving rise to Copperweld's claims occurred in the district:  Encore and Southwire conspired with Cerro, which resides in this district.

## **FACTUAL BACKGROUND**

## **CCA Develops as a Viable and Cost-Effective Alternative to Copper**

21.     Residential buildings are built with conductive wiring throughout, which connects to and serves electric lighting, outlets, heating and cooling, and appliances.  Copper historically has been the material used to produce this conductive wiring, with the industry consuming more than 50% of all copper used in the United States.

7

22.     As a metal that must be mined, copper is subject to fluctuating prices, spiraling cost, and uncertain supply.  In the late 1960s, as the Vietnam War diverted the stock of copper into brass for munitions and drove up the price, builders began to search for alternatives to copper wiring.

23.     At the time, residential builders in the United States first turned to single-metal aluminum as a substitute for copper wiring.  Aluminum was less expensive than copper and more available during the war.  Aluminum, however, is also prone to "creep"—wherein the material moves after exposure to heat—causing the connection to loosen.  Aluminum also has a 25% higher thermal expansion rate than copper and two-times lower tensile strength, making the material brittle after heat exposure and subject to breaking.

24.     Additionally, as most of the connectors in residential buildings were copper and had been designed for use with copper wiring, connecting those copper connectors to aluminum wiring subjected the aluminum to galvanic corrosion, a type of damage that occurs due to an electrochemical reaction.  Both creep and galvanic corrosion can cause a connection to fail and, potentially, overheat.

25.     Finally, single-metal aluminum conductors all form an aluminum oxide layer on surfaces that are exposed to air, which is a layer that is non-conductive and prevents electrical current from passing over the interface between the wire and the electrical contact of the connection (e.g., equipment, receptacles, switches, splice

8

connectors).  Without sufficiently cracking the aluminum oxide layer when making terminations and splices, allowing current to pass through the cracks in the aluminum oxide layer, the terminations and splices will heat up due to the increase in resistance.  This phenomena has led to cases of "thermal runaway" where the electrical contacts become so hot that the materials in the vicinity of the contact begin to burn.

26.   The U.S. Consumer Product Safety Commission ("CPSC"), which had initially been created by an act of Congress in 1972 to bring uniformity to the regulation of national standards and ease the burden of regulation upon the states, soon began investigating aluminum wiring.  The CPSC found numerous hazardous incidents and fires involving aluminum branch circuit wiring.  It is estimated that over 50,000 house fires across the nation were caused by aluminum wiring, including a fire on April 28, 1974 in Hampton Bays, New York in which two people died.  Fire officials there determined that the fire was caused by an overheating aluminum wire connection at a wall receptacle.

27.   An ad hoc committee on aluminum terminations was formed in June 1972 by Underwriters Laboratories, Inc. ("UL")—a mainstay in the wiring industry for safety testing—for industry members to study and recommend procedures for improving the connectability of aluminum conductors and to mitigate the problem of house fires.  Despite an inability to reach a decisive position among the diverse

interests represented, the committee ultimately encouraged local municipalities to ban aluminum wiring for use in residential buildings. Single-metal aluminum wire was thereafter banned in most United States markets by local authorities.

28. The introduction of CCA to the market not only avoided the issues associated with aluminum, but provided a less expensive option to single-metal copper wiring. CCA provides the safety and performance benefits of copper, without the additional weight and cost.

29. Although its history actually dates back further, CCA as we know it today was developed in the 1960s by Texas Instruments ("TI") as a safe alternative to copper wiring. CCA is a "bimetal" made of a solid aluminum core covered in a copper skin and metallurgically bonded. Copperweld's CCA is composed of 27% copper and 73% aluminum.



30. Unlike single-metal aluminum wiring, CCA does not oxidize or corrode at connection terminals. Rather, the copper and aluminum in CCA are separated in two distinct metallic zones, with the copper covering entirely the aluminum core and providing a copper to copper connection at connection terminals. Additionally, like

10

copper, CCA is not susceptible to creep and is stronger and less brittle than aluminum. Finally, the process of copper cladding removes the aluminum oxide layer, replacing it with Oxygen Free Copper, the most highly conductive, corrosive-resistant and thermally stable copper on the market today, which also prevents the aluminum oxide layer from reforming. This provides an extremely conductive surface available for safe electrical connections and, unlike aluminum, not subject to oxidation.

31.     In addition to having safety and circuit durability comparable to single-metal copper wiring, CCA offers several advantages over copper. For one, its aluminum core makes it lighter and easier to carry for installation. As a bimetal—rather than 100% copper—it also has little street scrap value, which reduces theft. Yet, perhaps its most important advantage is that it is a more affordable alternative to full-copper wiring and—because the price of aluminum is more stable—less susceptible to the fluctuation in pricing experienced by copper. CCA as a conductor material, therefore, offers considerable value to the consuming public, and gives contractors a safe code-compliant alternative to single-metal copper conductors.

32.     Although CCA was installed in residential homes in the United States throughout the 1970s, by 1979, copper prices had bottomed out and the industry largely returned to copper wiring. Production of CCA for use in residential building wire was halted for approximately thirty years as copper prices remained low.

11

33.     The price of copper again rose dramatically—this time quadrupling—through the 2000s, largely due to demand in Asia and the installation of an industry-wide price stabilization mechanism.

34.     Copperweld was founded in 1915, and has been manufacturing CCA for coaxial cable and other, non-residential markets, since the 1970s, selling millions of pounds of the material annually.  In 2013, Copperweld acquired the rights to the TI CCA cladding technology for use in residential wiring.  In 2018, in response to the increase in the cost of copper, Copperweld resumed the manufacture and distribution of CCA for residential buildings using TI's method in addition to its own cladding method.  Today, Copperweld is the only seller of CCA wire for residential buildings in the United States, and sells its product throughout the country.

## CCA is Tested and Found To Be as Safe as, or Safer than, Copper

35.     UL began testing CCA in the late 1960s using CCA manufactured by TI.  In an April 2, 1971 bulletin, UL found it appropriate to extend recognition to CCA conductors for use in all terminals suitable for copper conductors, following heat cycling testing.  In other words, UL found that CCA residential wire was an appropriate substitute for copper wire.[1]

---

[1] CCA is "upsized" two sizes for use in place of copper wire, meaning that 10-gauge CCA is equivalent to 12-gauge copper wire.  A larger number gauge in wire denotes a smaller wire.

36.    For the test, five samples of CCA wire and five of copper wire were set up in circuits.  Electricity was then cycled through the circuits, 3.5 hours on and 0.5 off.  UL measured the temperature of both the copper and CCA wire at various points, with failure specified as any time the material reached 175 degrees Celsius, chosen because that is the temperature at which commonly used insulation material melts.  CCA performed comparably to copper in thermal testing and outperformed copper in life testing, which tests for the durability of the wire when assembled in a circuit.

37.    In 2011, a third-party lab again tested CCA, supplied by Copperweld, against copper wiring, pursuant to UL 486C standards.  The UL and other accrediting agencies have developed testing standards to identify points of potential failure.  UL, for example, developed UL 486C for this purpose.  UL designed UL 486C to measure and give insight into thermal stability in conductor core-metal in splice connections to avoid thermal creep, the primary factor thought to be responsible for arc-faulting at points of termination/connection.  The test is rigorous.  It purposely cycles higher-than-permitted-by-code voltage through each test-sample conductor, in periods of on–off power over 500 cycles.  The test takes months to complete.  The aim of UL 486C is to locate the stress points in the test samples under the worst conditions that a real-world installation could possibly afford.  Both copper and CCA passed this test, and CCA showed less creep than copper in many of the test samples.

13

38.    As a result, CCA is included in the UL-719, UL's safety standard for non-metallic sheathed (NM or NM-B) cable—with "NM" meaning that the metal conductor is covered in plastic sheathing and the "B" denoting a heat rating—the predominant form of residential wiring widely used in the United States.

39.    Since 1971, the year CCA first appeared in the NEC, approximately two hundred thousand (200,000) residential homes have been wired with NM cable made with CCA—which has not caused a single house fire.  To the contrary, in an investigation conducted in approximately 2016 where CCA wire was harvested from homes in which it was installed in the 1970s, the samples showed no creep or galvanic corrosion and generally appeared in excellent condition.

40.    In 2020, a "Bimetals Task Group" formed by the Standards Council of the NFPA ("NFPA Task Group") performed temperature testing of termination points comparing 14-gauge CCA to 14-gauge copper, installed in accordance with the NEC.  The NFPA Task Group found that when CCA wire is run at its full ampacity rating, the heat generated at the termination points run significantly cooler than the copper wire run at its full ampacity rating (*i.e.*, 10 amps for 14-gauge CCA and 15 amps for 14-gauge copper).  In short, the NFPA Task Group found and confirmed that CCA is just as safe as copper if not more so—*i.e.*, the risk of over-heating and damage is lessened when using CCA over copper in accordance with NEC installation guidelines.

14

**The National Electrical Code**

41.    The NEC—officially titled NFPA 70, The National Electrical Code®—is a model code for electrical safety in residential, commercial, and industrial occupancies, establishing the standard for safe electrical installations.

42.    The NEC was first developed in 1897 by the National Conference on Standard Electrical Rules.  NFPA became the official sponsor in 1911.  The NFPA is a global, self-funded nonprofit organization, established in 1896, devoted to eliminating death, injury, property and economic loss due to fire, electrical and related hazards.

43.    The NEC's purpose is to provide the minimum requirements for safe electrical installation into buildings (residential homes, businesses, industrial facilities, etc.).  Section 90.1(A) of the NEC states: "The purpose of this *Code* is the practical safeguarding of persons and property from hazards arising from the use of electricity.  This *Code* is not intended as a design specification or an instruction manual for untrained persons."

44.    Having wire approved for inclusion in the NEC is a two-step process. First, a product, such as an NM cable intended for use in residential wiring, must be tested and found suitable for a specified purpose.  The most commonly used testing organizations are UL, Intertek (ETL), and Canadian Standards Association (CSA). When a product is tested and meets the accepted product safety standards, which are

15

typically accredited by the American National Standards Institute, it is "listed" by that laboratory.  Second, if the listing relates to new features or characteristics not yet recognized in the code, the NEC may also be updated to permit the use of those products or features in the field.  This sometimes involves making changes to multiple sections of the NEC.  Once a wire is "listed" and included in the NEC, bringing it to market is straightforward and relatively certain, offering fewer opportunities for anticompetitive scheming.

45.     The NEC has been adopted by most states, counties and municipalities across the United States—and in several other countries—by "Authorities Having Jurisdiction" ("AHJs") in each locality.

46.     The NEC is updated and published every three years in a multi-stage process that takes approximately two years to complete.  The Public Input Stage collects suggested changes from the public, along with various committees and associations.  The NEC has eighteen code-making panels comprised of industry members, which conduct a first-level review of all suggested changes, and a technical correlating committee ultimately responsible for reviewing the work of the code-making panels.  In the Comment Stage, comments are submitted on the first draft, which are later reviewed by the appropriate code-making panel.  An NFPA Technical Meeting is held, where certain parties may make a motion, raising comments or concerns regarding the prior two stages.  NFPA members then vote on

each motion, which is decided by a simple majority.  Finally, any appeals from the grant or denial of motions are heard by the Standards Council, and the new edition of the code is issued.

47.     The 18 code-making panels have primary responsibility for revising and expanding the NEC during each revision cycle.  Representatives from various stakeholders in the electrical industry—such as inspectors, manufacturers, the electrical workers union, contractors, electrical utilities, users of electrical equipment (e.g., builders and hospitals), and research or testing laboratories—make up these code-making panels.

48.     NEC code-making panels can be particularly susceptible to a collusive scheme.  It is commonplace—even expected—that at least some members of a NEC code-making panel will be business competitors.  And by bringing them together to develop industry standards affecting their own products, the NEC code-making process can facilitate illegal agreements to manipulate NEC requirements to exclude rivals, harming competition in the process.

49.     Although the NFPA has regulations requiring that no more than one-third of a code-making panel's members represent a single interest, such regulations do not eliminate opportunities for economically-interested parties to abuse the NEC code-making process and achieve anticompetitive ends.

17

50.     As Paul Abernathy, Defendant Encore's Manager of Codes & Standards, acknowledged in a moment of honesty during a podcast in May 2021, "there's always an angle in every [code or standards development] meeting to try to position your product over somebody else's."

51.     Moreover, the structure and operation of the NFPA's NEC code-making panels make them especially susceptible to collusive campaigns. Votes are sometimes cast by decision-makers on the panel with little expertise in a particular area. Deceptive and misleading campaigns can influence such decision-makers' votes in ways that do not reflect actual facts or data.

52.     The NFPA's status as a private organization magnifies the potential for abuse. Unlike a legislator who must answer to his or her constituents or a court subject to external appeal and review, the NFPA and its leadership have no accountability to the general public. And while the NFPA administers its codes and standards development process, and establishes rules to promote fairness, the NFPA does not independently test, evaluate, or verify the accuracy of any information that goes into the NEC.

53.     Additionally, members of NEC code-making panels often have business relationships with each other, resulting in inappropriate "back-scratching." Because the NFPA is insulated from other curative measures, litigation can be the only effective way to remedy wrongful conduct.

54.     CCA was first included in the NEC in 1971 in Article 310 on Conductors, following testing by UL.  In the 1976 edition, CCA was officially defined as "Conductors drawn from a copper clad aluminum rod with the copper metallurgically bonded to an aluminum core.  The copper forms a minimum of 10 percent of the cross-sectional area of a solid conductor or each strand of a stranded conductor."  There are currently over 30 references for CCA accepted in the NEC, including for 10- and 12-gauge wire.  CCA is one of only three conductor materials permitted by the NEC to carry continuous current for branch circuits.  The other two are single-metal copper and single-metal aluminum.

## **UNLAWFUL CONDUCT**

### **Cerro Leads Efforts to Organize Copper Wire Stakeholders Into An Unlawful Agreement**

55.     Cerro, Encore, and Southwire compete with Copperweld in the residential electrical wire market and sell single-metal copper and aluminum wire throughout the United States.

56.     In the run up to the 2020 edition, Copperweld petitioned to add 14-gauge CCA wire—the next smaller size—to the NEC.  Although it had not been approved previously for use in residential buildings, 14-gauge CCA had already been proven through third-party testing to be a valuable alternative to the public for small circuits such as for LED lighting in buildings, and had long been used in the coaxial data cable industry.

19

57.     Copperweld's proposal was directed to CMP-6, one of the NFPA's 18 code-making panels for the NEC, which has purview over Chapter 3 of the NEC— Wiring Methods, Conductors and Conductor materials.  Cerro's Vice President of Engineering, Christel Hunter, is an influential member of CMP-6.  She is also a board member and Vice Chair of the Codes & Standards Committee for the National Electrical Manufacturers Association ("NEMA").

58.     Cerro understood that Copperweld's 14-gauge CCA wire would compete with its copper wire for LED lighting circuits and certain other applications, and perceived a competitive threat based on the lower prices and performance advantages Copperweld's product would offer.  These price and quality advantages threatened to induce customers to switch some or all of their wire purchases from Cerro to Copperweld, forcing Cerro—and other single-metal copper wire manufacturers—to lower their prices or compete more effectively in other ways.

59.     Cerro's Hunter coordinated the opposition among the panel members on CMP-6, and Copperweld's 14-gauge CCA proposal ultimately did not gain enough support to be included in the 2020 Edition of the NEC for use as a power conductor with an assigned ampacity rating, despite the credible substantiation provided by Copperweld.

60.     However, while the NFPA denied Copperweld's final proposal at its August 2019 meeting at the recommendation of the code-making panel, due to

20

Copperweld's credible substantiation of the safety of 14-gauge CCA, the NFPA established the Bimetals Task Group (the "NFPA Task Group") to review the proposed changes to the 2020 Edition of the NEC that related to CCA conductors and also to recommend changes for the next revision cycle of the NEC, the 2023 Edition.

61.     The NFPA Task Group was comprised of stakeholders and independent interests from across several panels, including members from two testing laboratories, installing electricians, electrical contractors, electrical inspectors, experts in over-current protection and wiring devices, the utility sector, as well as a balance of wire and cable manufacturers (*i.e.*, producers of aluminum, copper and CCA conductors).  The NFPA Task Group began meeting in March 2020.

62.     Cerro, Encore, and other copper wire stakeholders immediately understood that the growing momentum for 14-gauge CCA, as shown by the creation of the NFPA Task Force, threatened their dominance in residential electrical wire. But rather than compete on the merits, they resorted to conspiracy, deception, and disparagement.

63.     The seeds of Defendants' conspiracy date back to at least April 28, 2020, when Cerro's Hunter and Encore's Paul Abernathy and Kevin Porter, along with various others, met virtually through Zoom for a Copper Development Association ("CDA") meeting about the NEC 2023 cycle.

21

64.    CDA is a trade association that bills itself as "the market development, engineering and information services arm of the copper industry, chartered to enhance and expand markets for copper and its alloys in North America." Cerro, Encore, and Southwire are members of CDA.

65.    At the April 28, 2020 meeting, Cerro's Hunter was frank: should 14-gauge CCA conductors be permitted by the NEC, it will be ***"an overall loss"*** for copper—not a good development for Cerro, Encore, or other copper wire manufacturers. Hunter stressed that ***"com[ing] up with a position"*** to address the CCA ***"Concern"*** was ***"a key priority for us."*** During this meeting, it was agreed that a "subgroup" of CDA members—consisting mainly of the copper wire manufacturers—would meet separately for the sole purpose of "***build[ing] opposing information***" to fight the competitive threat 14-gauge CCA posed to their revenue and profits.

66.    Following this meeting, Cerro, through Hunter, conducted a sham test in Hunter's garage that purported to show that 14-gauge CCA wires were unsafe (the "Garage Test"). Hunter presented the results of the Garage Test to members of the NFPA Task Group on or around May 22, 2020.

67.    The Garage Test suffered from a variety of failings. First, because the alleged safety concerns were not genuine, Hunter tested only CCA and did not use any control, such as single-metal copper wire. It is widely acknowledged that proper

22

study design requires a control group to render reliable results; studies without them are effectively useless.

68.    Cerro's Garage Test had other major flaws as well.  Even though standard temperature-testing is generally conducted in open air, Hunter mounted her CCA sample to a board and then placed it under insulation, as shown in the image below.



69.    Hunter claimed she was attempting to mimic "real-life" or "typical" installation conditions, but that made no sense: because a power conductor's insulation is not directly under (in contact with) wall insulation.  This did not replicate real-world conditions, nor did it follow any NEC-referenced wiring method.  UL 1581, the foundational safety standard upon which listing programs for

specific conductors and wiring methods are built, has no test sequence that requires conductors be tested under thermal wall or ceiling insulation.

70. In addition to not being performed by an accredited laboratory, Cerro's Garage Test was not witnessed by anyone other than Hunter. Hunter also failed to identify the source of CCA used in the Garage Test. It did not come from Copperweld because Copperweld did not produce 14-gauge CCA at the time and it was not commercially available.

71. Recognizing these flaws, the NFPA Task Group asked Hunter to replicate the Garage test using 14-gauge single-metal copper. Without that control, the results provided no basis to evaluate whether CCA wires behaved any differently from conventional, single-metal copper wires in that environment.

72. Although Hunter stated during a NFPA Task Group meeting on June 5, 2020 that she completed the comparative testing with 14-gauge single-metal copper and merely needed to put her results in the same format as her prior report, no such report or data were ever provided.

73. The only plausible explanation for this—*i.e.*, Cerro's flawed testing protocol and refusal to share results—is that the Garage Test was a sham designed to hide Cerro's anti-competitive intent, purpose, and motive. In short, the entire process was designed to subvert the proper functioning of the NFPA's codes and

standards development process and kill the competitive threat of the 14-gauge CCA wire product before it could get started.

74.    Even though 14-gauge CCA had already been found safe for the proposed uses, Cerro's Garage Test prompted the NFPA Task Group to direct additional testing to assuage any concerns Cerro's rigged Garage Test might have raised.  The testing, which was carried out during the summer of 2020, directly compared 14-gauge copper conductors and 14-gauge CCA conductors at the respective 60C ampacities, and was performed by Eaton Corporation's electrical laboratory, an accredited third-party laboratory that met the criteria of the NFPA Task Group, which included representatives from two Nationally Recognized Test Laboratories, UL and Intertek.  The testing found that CCA's terminations, when installed per the proposed NEC guidelines, had a heat rise of approximately half that of copper when each conductor is run at 100% of its respective ampacity ratings.

75.    Meanwhile, during this same period, Cerro's Hunter, Encore's Porter, Southwire's Dave Watson and various others began meeting privately via Microsoft Teams as part of the planned CDA "subgroup" intended to block 14-gauge CCA's inclusion in the NEC by working together to *"build opposing information."*

76.    During the subgroup's first meeting on July 10, 2020, the group discussed Cerro's Garage Test and the NFPA Task Group's reaction, acknowledging that the NFPA Task Group *"ha[s] test data [demonstrating CCA's safety] that will*

***stand on its own.***" Cerro's Hunter, Encore's Porter, and Southwire's Watson and others brainstormed ideas for testing CCA, eventually deciding that they would use a third-party for the testing and focus on the same purported safety concerns identified in Cerro's Garage Test.

77.     In subsequent meetings over the summer of 2020—and continuing by email through the end of the year—Cerro's Hunter, Encore's Porter, Southwire's Watson and various others discussed the scheme, including laboratories, funding, challenges acquiring materials for testing, and other logistical details, eventually leading to the CDA formally engaging a third-party field testing shop in Arizona, Hampton Tedder, to test CCA.

## Copperweld's 14-gauge CCA Gains Momentum

78.     In September 2020, the NFPA Task Group formally submitted a proposal to have 14-gauge CCA included as a permissible conductor in the next edition of the NEC, the 2023 edition. The NFPA Task Group made nineteen specific recommendations as part of the Public Input Stage, including recommending inclusion of 14-gauge CCA in the 2023 Edition of the NEC for use a branch circuit conductor.

79.     The NFPA Task Group supported adding 14-gauge CCA to the 2023 NEC by a vote of twelve to two. Only Cerro's Hunter and the CDA's representative voted against the proposal.

**Defendants' Collusive Campaign to Distort the NEC Code-Making Process**

80.     Cerro's, Encore's, and Southwire's coordinated efforts to block 14-gauge CCA evolved and strengthened by early 2021, as Defendants grew increasingly fearful that Copperweld would soon be eating away at their revenue and profits given the wide support the NFPA Task Group's proposal was getting from members of the NEC code-making panels.

81.     From December 2020 to early January 2021, NEC CMP-6 met virtually via Microsoft Teams to review the NFPA Task Group's recommendations, officially called "public inputs."  Although Cerro's Hunter opposed the NFPA Task Group's proposal to add 14-gauge CCA as a permitted type of branch circuit conductor to the 2023 NEC,[2] CMP-6 approved it by a landslide vote of twelve to two.  Cerro's Hunter and the CDA's representative on CMP-6, Brian Deacy, were the two votes in opposition.  The official ballot results were circulated in April 2021.

82.     This victory for Copperweld prompted Cerro, Encore, and Southwire to double-down on their efforts to shut 14-gauge CCA out of the residential electrical market.  Building on their existing coordination and communications relating to CCA testing through the anti-CCA "subgroup," they began collectively developing a response over the next few months.

---

[2] CMP-6 had three principal (voting) members from the copper stakeholders: Hunter (Cerrowire); Brian Deacy (CDA's representative), and Dave Watson (Southwire). Encore's Kevin Porter was an alternate (non-voting) member.

83.    By mid-summer 2021, Cerro, Southwire, and Encore had settled on a strategy to block 14-gauge CCA by flooding CMP-6 with deliberately-flawed studies that were expressly modeled after Cerro's earlier Garage Test. They would use these studies to support submissions they would make during the second, Comment Stage of the NEC revision cycle.

84.    On July 1, 2021, Cerro's Hunter, Southwire's Watson, Encore's Porter, the CDA's John Hipchen, who had been coordinating the Hampton Tedder testing, met privately on Zoom to discuss the group's collective strategy. During the meeting, Hunter shared a slide deck summarizing the Garage Test, and the group agreed: (1) to "incorporate" what Hunter did "into the test plan that Hampton Tedder will perform," and then (2) "reproduce" it in the third-party testing laboratory that Southwire had retained.

85.    In an email to John Hipchen that same evening attaching CCA-related testing CDA had sponsored in Canada, a CDA colleague suggested speaking to a Mexico-based colleague who "could share some experience" if Hipchen was *"plan[ning] to do something to block CCA's penetration into the US residential market."*

86.    By July 22, 2021, approximately three weeks later, Cerro, Encore, and Southwire had agreed that Cerro's Garage Test would also be "reproduced" in (1)

28

Southwire's own Cofer lab, and (2) the Cerro-affiliated Marmon lab, for a total of four sham studies.

87.    Cerro, Encore, and Southwire were motivated to act collectively because they knew that having multiple studies following the same, flawed protocol would create a dense layer of misinformation, which was critical given the wealth of sound scientific data proving 14-gauge CCA was safe.  In order to distort the NEC CMP-6 decision-making, Defendants knew they would only succeed if they exploited the advantages of acting jointly.  This joint action permitted Defendants to exploit the inherent weakness of NEC processes, which created an opportunity of spreading misinformation and causing CMP-6 decision-makers with less expertise in particular areas to reject a new technology as a consequence of this manufactured confusion.

88.    Cerro, Southwire, Encore and CDA, through their representatives, used this faulty testing to support their comments aimed at preventing the inclusion of 14-gauge CCA in the 2023 NEC.  They began collectively writing their comments in July 2021—before testing was to start in August—because they **_"already ha[d] a good idea of what the data will show,"_** underscoring the sham nature of the tests which were rigged to fail from the start.

89.    Because the sham tests were intended to manipulate the CMP-6 members' decision-making—not address genuine safety concerns—Cerro,

29

Southwire, and Encore went to great lengths to ensure they aligned their submissions to the NFPA.

90.    On August 13, 2021, a week before the NFPA's deadline for submitting comments on the 2023 NEC First Draft, Cerro's Hunter and Southwire's Watson submitted near-identical comments aimed at preventing the inclusion of 14-gauge CCA within *46 seconds* of each other.  In these comments, Hunter and Watson each pointed to sham tests, modeled after the Garage Test, that they had conducted in furtherance of the conspiracy.  Hunter's comment referenced testing at the Cerro-affiliated Marmon Innovation and Technology Center.  Watson's comment referenced testing at Southwire's test lab, the Southwire Cofer Technology Center, and included a test report.

91.    On August 17, 2021, Cerro's Hunter, Southwire's Watson, Encore's Porter, and the CDA's John Hipchen met via Zoom to coordinate and harmonize the rest of their comments, and made arrangements to meet separately in smaller groups in the days leading up to the August 19, 2021 deadline.

92.    On August 18, 2021, the CDA's John Hipchen—acting to further the interests of Cerro, Encore, and Southwire—submitted a comment aimed at preventing the inclusion of 14-gauge CCA that was nearly identical to those submitted by Cerro's Hunter and Southwire's Watson on August 13.  Hipchen's

comment referenced testing by Hampton Tedder that was modeled after the Garage Test and included a test report.

93.    On August 19, 2021, Encore's Porter submitted a short comment aimed at preventing the inclusion of 14-gauge CCA with nearly identical language to those of Cerro's Hunter, Southwire's Watson, and CDA's Hipchen.

94.    Following the close of the NEC 2023 comment period on August 19, 2021, the NFPA consolidated these and other comments, and sent them to CMP-6 in September 2021.

95.    Between October 25 and 27, 2021, CMP-6 met virtually via Microsoft Teams to consider the submitted comments and vote on whether or not to accept them.

96.    When Defendants' proposals to remove 14-gauge CCA from the draft of the 2023 NEC were put to ballot after this debate, the votes were split.  Just as Defendants intended, their collusive scheme to flood the panel with sham tests confused four of the CMP-6 decision-makers, causing them to vote against including 14-gauge CCA in the 2023 NEC for branch circuits.

97.    Because the CMP-6 decision-makers had additional time to consider whether to change their votes before the official balloting, Copperweld created an exact replica of the sham tests, based on details in the test report Southwire's Watson had submitted.  Copperweld's testing, which was witnessed by Intertek, a Nationally

31

Recognized Testing Lab, showed that 14-gauge single-metal copper wire at 15 amps overheated *worse* than 14-gauge CCA wire at 10 amps. The Intertek report summarizing this evidence was distributed to CMP-6 in December 2021.

98. Despite this direct evidence contradicting the sham tests, the CMP-6 decision-makers did not change their votes. As the final ballot results circulated in January 2022 show, the proposal to add 14-gauge CCA to the 2023 NEC for branch circuits was ultimately defeated in CMP-6 by a vote of 8 opposed to 6 in favor. In explaining their votes, the CMP-6 decision-makers who rejected 14-gauge CCA all pointed to the sham studies as the basis for their votes. Because the needed 2/3 majority vote in CMP-6 was not achieved, the code text permitting for 14 AWG CCA for branch circuits in the 2023 NEC First Draft was removed.

**Cerro Introduces the False and Misleading FAQs**

99. In late April 2021, a key Copperweld customer and the largest residential electrical contractor in the State of Florida, Strada Electric ("Strada"), was informed that a number of its building sites in Florida were being "red tagged" by the Chief Inspector for Orange County, Florida because of Strada's use of CCA wiring, citing safety concerns.

100. Red tagging means that construction is halted by an inspector until the builder remediates the issue. Here, that would have meant the removal of all CCA wiring from Strada's buildings. Strada had never before been "red tagged" or

32

received any negative feedback on the basis of its use of CCA, despite having been a Copperweld customer since the fall of 2020.

101.  As noted above, while the NEC provides a tested and widely accepted set of standards, it is not federal law.  Accordingly, even if a wiring product is referenced by the NEC—as 10- and 12-gauge CCA are—it is up to the local AHJ to either adopt or reject that portion of the NEC and to allow installation of a product.

102.  Copperweld was surprised by the "red tagging", as well.  Peter Graser, Copperweld's Product Manager, had presented to the Central Florida Division of the International Association of Electrical Inspectors ("IAEI")—the local trade organization for electrical inspectors—only months before on the safety of CCA.  At no point did the IAEI indicate to Mr. Graser that it had any concerns about the safety of CCA, nor that it was unwilling to allow its installation in residences in Orange County.

103.  Copperweld personnel, together with representatives of UL and NEMA, appealed the revocation to the Orange County Office of Inspection, and successfully proved the safety of Copperweld's CCA products.  But for the resolve and successful appeal by Copperweld, the revocation would have required the removal of the Copperweld CCA from hundreds of residences and its replacement with standard copper wire.

33

104.   On April 27, 2021, as Copperweld and others were dealing with the "red tagging" issue, Strada received a copy of an email string between Christina Slate of Paey's Electric ("Paey"), a Strada competitor (and potential Copperweld customer), and Maronda Homes ("Maronda"), a homebuilder and a common client of both Strada—and thus Copperweld—and Paey.   In the email string, Paey indicated that surging copper prices had caused Paey to raise its own prices.   In response, because Maronda had previously used CCA wire in projects with Strada, Maronda suggested that Paey switch to CCA.   Slate responded, citing "concerns" about CCA and attaching a document created by Cerro titled "Copper Clad Aluminum FAQs," (the "FAQs") which she claimed highlighted the issues with CCA.   Maronda forwarded the FAQs to Strada, which sent them to Copperweld.

105.   A true and correct copy of the FAQs, which are on Cerro's letterhead, is attached hereto as **Exhibit A**.   Upon information and belief, as described in more detail below, the FAQs were drafted and/or directed by Cerro from its headquarters in Alabama and distributed to customers in other states, including Florida.   As noted, Copperweld is the only manufacturer of CCA in the United States for residential wiring.   The FAQs thus refer exclusively to Copperweld's product.

106.  The FAQs were designed to deceive customers by falsely and misleadingly conflating CCA with single-metal aluminum wiring, which, as noted

above, had been shown to pose significant safety hazards in the 1970s. Nearly every

paragraph of the FAQs makes false statements:

| False or Misleading Statement in FAQs | Truth |
|---|---|
| (a) "**What is Copper-Clad Aluminum wire?** Just like aluminum in the 1970s, Copper-Clad (CC) Aluminum wire is made with cheaper aluminum in an attempt to save money. In the 1970s, aluminum wire was installed in millions of homes, and there were so many failures that a government agency was formed to evaluate the danger in those homes. The Consumer Products Safety Commission was formed in the 1970s, and their first charge was to hold hearings and investigate the reports of fires and deaths associated with aluminum conductors. The hybrid metal used in CC Aluminum (sometimes referred to as CCA) is 90% aluminum with a thin copper skin on the outside. The copper is bonded to the aluminum, a complex process that results in a conductor that is not suitable for recycling into high quality products, unlike pure copper conductors." Ex. A at 1. | CCA is a metallurgical class of metal that bears no resemblance to the aluminum wiring of the 1970s, nor is the copper in CCA a "thin skin." CCA has a thick copper cladding that prevents the risk of overheating associated with aluminum of the 1970s. For example, Copperweld's CCA is 27% copper and 73% aluminum by weight. Cerro's inclusion of facts about 1970s aluminum—in a document that purports to define CCA—is an attempt to deceive potential and existing CCA consumers that CCA is an equivalent product to 1970s aluminum. Finally, contrary to the statement in the FAQs, CCA can be recycled, for example, by being melted down into brass, which contains both copper and aluminum. |
| (b) "**Are switches and receptacles listed for CC Aluminum?** There are some connections that are listed for use with CC Aluminum, so be sure to look for the marking that | Per UL standards, switches and receptacles that are listed for use with copper wiring are also appropriate for use with CCA. The code does not require that these elements be "marked" |

35

| | | |
|---|---|---|
| | indicates switches, receptacles and breakers are suitable for the use. In the 1970s, one of the dangers of aluminum was improper installation on connections that were not rated for the use. Another danger was the incorrect sizing of the conductors, and CC Aluminum conductors need to be two AWG sizes larger than copper to safely carry the same amount of current." *Id.* | for use with CCA, nor is there any connection between CCA and the dangers of aluminum in the 1970s. Indeed, installation of *any* wire in a residential home—copper, CCA or otherwise—should follow the guidance of the NEC and UL safety standards. |
| (c) | "**Does CC Aluminum carry the same amount of current?** No. Substituting the same size CC Aluminum in place of copper violates the National Electrical Code requirements. To avoid dangerous overloading of the wire, CC Aluminum must be two AWG sizes larger than the normal copper conductors. Copper conductors run much cooler than equally sized CC Aluminum conductors on equal ampacity circuits." *Id.* | While the NEC requires that CCA be "upsized" two gauges in replacing copper wire, when upsized appropriately, copper and CCA run at comparable temperatures when exposed to equal ampacity currents. Additionally, third-party testing of 14 AWG CCA done by the NFPA Task Group shows that, when properly upsized, CCA runs as cool as, or cooler than, copper wiring, when each is run at its respective full ampacity. |
| (d) | "**Do I have to change the box or conduit size when I use CC Aluminum conductors?** Choosing the correct box and conduit size is important, and those sizes are regulated by the National Electrical Code. Since a larger conductor is required to carry the current, larger boxes and larger conduits must be used for the wiring methods. Improperly sized boxes and conduits can lead to overfill, overheating and | Because CCA is installed at the start of a build, no "change" is required in the boxes used. Moreover, the statement that improperly sized boxes may lead to overfill, overheating, and damage is not unique to CCA, but is true of any wiring, including copper. |

| | |
|---|---|
| damage to the insulation on the conductors." *Id.* | |
| (e) "**What about insurance for homes and buildings?** Many insurers refuse to insure homes and apartment buildings with aluminum branch circuit wiring. In other cases, additional inspections and wiring changes are required before insurance is issued, and the premiums may be more expensive to cover the risk of electrical fires." *Id.* | Copperweld is unaware of *any* insurer, much less "many insurers," that require wiring changes or otherwise refuse to insure a house wired with CCA. Cerro's statement referring to insurers purported willingness to insure buildings with *aluminum branch* wiring is irrelevant to FAQs purportedly about CCA and is, once again, designed to falsely associate CCA and single-metal aluminum wiring in consumers' minds. Indeed, there have been no reports linking CCA wiring to any residential fire. |
| (f) "**Are CC Aluminum cables larger than copper cables?** CC Aluminum has a larger diameter than copper for the same current-carrying capacity. This requires more conductor metal, more insulation, and more jacketing material." *Id.* | While CCA must be "upsized" in accordance with the NEC, the implication that the larger size requires more materials, and thus costs more, is incorrect given the high cost of copper. When upsized, CCA actually offers a greater current carrying capacity than copper wiring of the same rating. |
| (g) "**Is CC Aluminum cheaper than copper wire?** When comparing equal ampacity sizes, this comparison is dependent on the price of copper at time of quote. To determine if the overall installation is cheaper, it will require an evaluation of the equipment it is connected to, as well as the boxes and conduit to make sure they are appropriate for the larger wire and dissimilar metal." *Id.* at 2. | As noted above, given the thick cladding of copper on the outside of the CCA product, connection points are copper-to-copper. There is no "dissimilar metal" to consider. |
| (h) "**Is CC Aluminum environmentally friendly?** The process used to metallurgically bond | The copper and aluminum in CCA are not separated at the end of life. Rather, as noted above, CCA can be recycled, |

37

| | | |
|---|---|---|
| | the copper to the aluminum core demands significant energy usage and separating the metals at end of life requires the use of strong chemicals that must be carefully handled to avoid contamination of the environment." *Id.* | including by being melted down into brass. |
| (i) | "**How do I prevent corrosion at the terminations?** Dissimilar metals are subject to galvanic corrosion. If the thin outer layer of copper is scratched off or damaged, using an oxide inhibitor will prevent corrosion and failed connections." *Id.* | While "[d]issimilar metals are subject to galvanic corrosion," there are no dissimilar metals at connection points with CCA. The NEC recognizes CCA and copper as similar metals, unlike copper and aluminum and CCA and aluminum. Moreover, given the thick layer of copper-cladding in CCA, which is bonded to the aluminum, the copper does not "scratch[] off" to any meaningful degree. Rather, a 2016 study of houses wired with CCA in the 1970s showed that the wiring remained in working condition. |
| (j) | "**As an inspector, what should I look out for with CC Aluminum?** Make sure that all switches, receptacles, and other equipment are listed and marked as suitable for use with CC Aluminum conductors. Also make sure that boxes and conduits are large enough for the larger wire, and that the thin layer of copper has not been damaged at connection points." *Id.* | As noted, neither marking nor damage at connection points is a concern when using CCA, nor is the layer of copper cladding "thin." Such concerns have been disproven both by testing as well as a half century of service in real-world residential circuits in the form of NM cable. |
| (k) | "**Is CC Aluminum more energy efficient?** Based on actual usage and common loading, there is no significant energy efficiency advantage between common | Because it is bonded to copper, the aluminum in CCA is not subject to expansion like the single-metal aluminum of the 1970s. It is also untrue that loose connections—of any type of |

| | | |
|---|---|---|
| | conductor metals. Additionally, when using CC Aluminum conductors, it is important to use a torque screwdriver on the screws used in switches, receptacles and circuit breakers. The aluminum used in these conductors expands and contracts at a greater rate than the metals used in connectors, like steel or brass. Loose connections can consume more energy, leading to a decrease in efficiency." *Id.* | wire—consume more energy. Finally, when upsized, CCA is more energy efficient than single-metal copper of the same ampacity rating. |
| (l) | "**Will CC Aluminum conductors reduce the risk of theft?** Because CC Aluminum conductors have a thin layer of copper, thieves will most likely think they are stealing copper conductors and won't discover the difference until the scrap yard won't buy the CC Aluminum conductors. The hybrid aluminum/copper conductors have very little scrap value and normally must be diverted to a landfill. To separate the two metals completely, corrosive acids are required." *Id.* | As noted, recycling CCA does not require the separation of the metals or any corrosive materials. The entirety of the metal may be melted down to create brass. |

107. In addition to a litany of literally false statements, the FAQs mislead consumers to believe that CCA wiring is unsafe and is no different—and possesses the same safety concerns as—aluminum wiring from the 1970s. The FAQs are replete with unnecessary discussions and false comparisons with aluminum branch wiring, such as the CPSC investigation of aluminum and the purported difficulty of insuring a home with aluminum—neither of which have anything to do with CCA.

The FAQs even refer to CCA as "CC Aluminum," a term not used in the NEC, UL, or any other standards, which serves only to highlight the word "aluminum" and minimize the word "copper." Cerro's circulation of the FAQs appears designed to frighten potential and existing Copperweld consumers, suggesting that CCA is prone to the same house fires caused by aluminum wiring used in the 1970s.

108.   Since receiving the FAQs, neither Maronda nor Paey has purchased CCA from Copperweld for their joint projects, despite Maronda's initial interest in doing so.  Upon information and belief, these potential sales were diverted from Copperweld and to copper wiring because of the FAQs.

**Cerro Creates the FAQs to Damage Copperweld**

109.   Copperweld recently learned that the FAQs were created by Cerro in December 2019 for the explicit purpose of unfairly competing against Copperweld's lower prices and to otherwise damage Copperweld.

40

███████████████████████████████████████████

████████████████████████

110. Hunter drafted the FAQs in response. ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

111. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

112. Importantly, these entities and individuals did not include Paey, making clear that Cerro or the recipients of the FAQs further distributed the document.

113. In addition, although Copperweld was in discussions with ████████ for what would have been significant sales, ████████ did not purchase any of Copperweld's products at the time as a result of these conversations. And, while it has since begun to purchase CCA, these sales have occurred primarily only in the last month, and the volume is low as compared to similar customers of its size and capacity. Upon information and belief, Cerro distributed the FAQs or the false statements included in the FAQs to ████████ to unfairly compete with

Copperweld's lower prices for CCA, causing ███████ to purchase from Cerro rather than Copperweld, or otherwise withhold business from Copperweld.

**Copperweld Continues to be Harmed by the FAQs**

114.   The potential harm from the FAQs has grown.  On or about June 8, 2021, Copperweld learned that, upon information and belief, Coresential distributed the FAQs to: Christina Slate, the President of Paey; Brad Oxley of Graybar, a national electrical distributor and one of Cerro's largest customers, who is also a member of the Brevard County Home Builders and Contractors Association ("HBCA"), of which Slate is President; and other members of the HBCA.  The HBCA is a significant presence in the area, with a membership of approximately seventy home builders and dozens of electrical contractors.

115.   In late June 2021, Copperweld learned that D.R. Horton, the largest builder in the United States, would no longer allow the installation of CCA in its residential buildings in the Orlando, Florida area.  Copperweld had previously sold CCA to D.R. Horton for installation in buildings in other markets, including Texas, Arizona, Alabama, and New Mexico, and had been in ongoing discussions with contractors working on D.R. Horton builds throughout early 2021 to do the same in Florida.  In late June 2021, Copperweld was informed by these contractors that D.R. Horton's Florida office would not allow the installation of CCA in its residential buildings in the Orlando area, and instead insisted on copper wiring.  Upon

information and belief, these potential sales to contractors employed by D.R. Horton were diverted from Copperweld and to copper wiring because of the FAQs.

116.   Each of these lost sales is significant.  The residential electrical wiring market is small and dominated by only a few key entities.  The lost sales detailed above represent a significant portion of the market and loss to Copperweld's potential sales.

117.   Upon information and belief, Cerro was aware of Copperweld's relationships with D.R. Horton and Strada, and of its prospective relationships with Paey and others.

## RELEVANT MARKET

118.   The market for residential electrical wire is a relevant product market.

119.   Other wiring products, such as commercial electrical wire, are not reasonably interchangeable substitutes for residential electrical wire.  Commercial structures—such as hospitals, malls, and warehouses—have higher electrical load demands, unique energy needs, and layouts that differ substantially from single-family homes and other residential structures.  As a result, commercial structures typically require larger wires with different technical characteristics (*e.g.*, types of conduit) than residential dwellings.  Commercial electrical wire is also typically far more expensive than residential electrical wire.  As a result, even where the NEC and other relevant codes do not prohibit it, contractors and builders purchasing

materials for residential construction would not consider commercial electrical wire to be a reasonable substitute.

120.    The relevant geographic market is United States because competitors in the market compete on a nationwide basis.

121.    Southwire, Encore and Cerro are the three largest makers of residential electrical wire in the United States, with an estimated combined market share of over 80%.

## **HARM TO COMPETITION BY CONSPIRACY**

122.    Defendants have harmed competition in the nationwide market for residential electrical wire by excluding from the market 14-gauge CCA wire, an innovative and cost-effective alternative for LED lighting and certain other energy-efficient applications.

123.    As a result of Defendants' conspiracy, customers in the relevant market have suffered, or will suffer: (1) reduced choice by the wrongful exclusion of 14-gauge CCA from the 2023 NEC, as 14-gauge CCA is less expensive, reduces labor and transportation costs because it is lighter weight, and is less attractive to thieves—among other benefits—than single-metal copper wire; (2) higher prices, since the introduction of competing 14-gauge CCA would have exerted downward pricing pressure on single-metal copper wire, and 14-gauge CCA would have provided a cheaper alternative; and (3) reduced innovation.

124.  Where the NEC is adopted, anything less than the standards set by the NEC are non-compliant by law and may not be installed.  Electrical contractors and builders will not risk installation under such circumstances.  As such, by **blocking** 14-gauge CCA from the 2023 NEC, Cerro, Encore, and Southwire have precluded Copperweld from moving forward to introduce 14-gauge CCA as an alternative to single-metal copper in the residential electrical wire market.  The NEC is adopted by most states, counties and municipalities across the United States.

## ANTITRUST INJURY

125.  Cerro's conspiracy with Encore and Southwire has harmed, and will continue to harm, Copperweld in the form of lost profits, and damaged equity and goodwill, diminishing the value of Copperweld as a going concern.

126.  By flooding the NEC CMP-6 with sham studies, Cerro, Encore, and Southwire have caused Copperweld to suffer stigma-related damages by creating a false perception among market participants that CCA is unsafe.  Just as the conspirators intended, this has caused Copperweld to lose revenue and profits from larger CCA wires that are currently included in the NEC.  In other words, these damages extend beyond the 14-gauge CCA product.

127.  Defendants' conspiracy has simultaneously harmed Copperweld and customers by excluding 14-gauge CCA from the residential electrical wire market,

and thereby artificially maintaining and/or increasing the prices paid by customers for residential electrical wire, reducing choice, and harming innovation.

128.    Although the mechanism of injury to Copperweld and to customers is the same, the damages caused by Defendants' collusion in the form of higher prices, reduced choice, and less innovation is distinct from, and not duplicative of, the damages caused to Copperweld, in the form of lost profits and damaged equity and goodwill.

129.    Copperweld is the most direct victim of the conspiracy, and apportionment of the harms suffered by Copperweld and those suffered by less-direct victims of the illegal activity will not be difficult.

130.    The conspiracy and its effects are continuing and ongoing.  Copperweld therefore reserves the right to supplement its complaint against these and other defendants.

## FIRST CAUSE OF ACTION
### (False Advertising Under the Lanham Act, 15 U.S.C. § 1125(a))

131.    Copperweld repeats and incorporates by reference the allegations contained in paragraphs 1 through 130 above as if fully set forth herein.

132.    The FAQs are commercial advertising or promotion consistent with Section 43(a)(1)(B) of the Lanham Act.

133.    The statements in the FAQs are false and/or misleading and have the capacity to deceive a substantial portion of Copperweld's intended customers and, upon information and belief, have actually deceived current and/or potential customers.  In particular, the FAQs employ false and/or misleading statements and comparisons with aluminum to deceive customers and potential customers of Copperweld into believing that CCA—a product exclusively manufactured and sold by Copperweld in the United States—is unsafe.

134.    Cerro's false and/or misleading statements are material, in that they are likely to influence, and have already influenced, consumers' purchasing decisions.

135.    By distributing these false and/or misleading statements from Cerro's headquarters in Alabama to Copperweld's potential customers in Florida and, upon information and belief, in other states, Cerro has placed the statements in interstate commerce.  Copperweld also sells CCA wire, the subject of the misstatements, nationwide, including in Florida from its headquarters in Tennessee.

136.    Copperweld has suffered injury as a result of Cerro's false and misleading statements, by direct diversion of potential sales, by a requirement that Copperweld take action to correct Cerro's false and misleading statements so that Copperweld can continue to conduct business in certain municipalities, and by a lessening of goodwill associated with Copperweld's products, in an amount to be determined at trial.

137.    Upon information and belief, Cerro has also received revenue as a result of these false and misleading statements, in an amount to be determined at trial.

138.    Copperweld continues to be damaged by Cerro's activities and conduct. Unless Cerro's conduct is enjoined, Copperweld and its goodwill and reputation will suffer irreparable injury that cannot be adequately calculated or compensated solely by money damages and for which there is no adequate remedy at law, including the inability of Copperweld to conduct business in certain states and municipalities.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Business Relations)

139.    Copperweld  repeats and incorporates by reference the allegations contained in paragraphs 1 through 138 above as if fully set forth herein.

140.    There exists a protectable business relationship as between Copperweld and its actual and prospective customers, including home builders, electrical contractors and others.

141.    Upon information and belief, Cerro knows and is aware of Copperweld's protectable business relationships with actual and prospective customers, including but not limited to Maronda, Paey, In Charge, and/or D.R. Horton and the contractors that supply D.R. Horton.

142.    Cerro knowingly, willfully and intentionally published false matter derogatory to Copperweld's business in a manner calculated to prevent others from

48

engaging with Copperweld, or otherwise to interfere with Copperweld's relations with others to Copperweld's disadvantage.

143.  Upon information and belief, Cerro was not a party to or agent of Copperweld's business relations, had no stake in Copperweld's business relations, and had no justification for interfering in its relationships.

144.  Copperweld has suffered and will continue to suffer damages resulting from Cerro's false and misleading statements concerning CCA.

## THIRD CAUSE OF ACTION
## (Conspiracy to Restrain Trade under § 1 of the Sherman Act, 15 U.S.C. § 1)

145.  Copperweld hereby restates and realleges the allegations set forth in paragraphs 1 through 144 above and incorporates them by reference.

146.  As alleged above, beginning at least as early as April 2020 and continuing thereafter, Cerro, Encore, and Southwire entered into and engaged in a conspiracy to block 14-gauge CCA from the 2023 edition of the NEC by subverting the code-making process.

147.  Cerro, Encore, and Southwire are Copperweld's primary competitors in the relevant market for residential electrical wire in the United States.

148.  Cerro's, Encore's, and Southwire's conspiracy constitutes a *per se* unlawful agreement.  Alternatively, even if the agreement among Cerro, Encore, and

Southwire is not *per se* unlawful, it constitutes an unlawful restraint under the rule of reason.

149. Cerro's, Encore's, and Southwire's conspiracy has no procompetitive benefits, and to the extent it did, they would be far outweighed by the substantial anticompetitive harms of that conduct. The alleged safety concerns and need for additional testing are illegitimate and pretextual, and are intended to mask their true anticompetitive motivations.

150. As a result of their unlawful conspiracy, Cerro, Encore, and Southwire have caused actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality in the residential electrical wire market in the United States.

151. Copperweld has been, and will continue to be, directly and proximately injured by Defendants' unlawful conspiracy and the damage it has caused to free and fair competition in the residential electrical wire market in the United States. Copperweld has already seen sales and profits reduced as a result of this illegal conduct.

## FOURTH CAUSE OF ACTION
## (Conspiracy to Restrain Trade under Code of Ala. § 6-5-60)

152. Copperweld hereby restates and realleges the allegations set forth in paragraphs 1 through 151 above and incorporates them by reference.

153.   As alleged above, beginning at least as early as April 2020 and continuing thereafter, Cerro, Encore, and Southwire entered into and engaged in a conspiracy to block 14-gauge CCA from the 2023 edition of the NEC by subverting the code-making process.

154.   Cerro, Encore, and Southwire are Copperweld's primary competitors in the relevant market for residential electrical wire in the United States.

155.   Cerro's, Encore's, and Southwire's conspiracy constitutes a *per se* unlawful agreement.  Alternatively, even if the agreement among Cerro, Encore, and Southwire is not *per se* unlawful, it constitutes an unlawful restraint under the rule of reason.

156.   Cerro's, Encore's, and Southwire's conspiracy has no procompetitive benefits, and to the extent it did, they would be far outweighed by the substantial anticompetitive harms of that conduct.  The alleged safety concerns and need for additional testing are illegitimate and pretextual, and are intended to mask their true anticompetitive motivations.

157.   As a result of their unlawful conspiracy, Cerro, Encore, and Southwire have caused actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality in the residential electrical wire market in the United States.

51

158.     Copperweld has been, and will continue to be, directly and proximately injured by Defendants' unlawful conspiracy and the damage it has caused to free and fair competition in the residential electrical wire market in the United States. Copperweld has already seen sales and profits reduced as a result of this illegal conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Copperweld prays for judgment against Defendants as follows:

(a)     Finding Cerro has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and common law;

(b)     Finding Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Code of Ala. § 6-5-60;

(c)     Preliminarily and permanently enjoining and restraining Cerro, its affiliates, subsidiaries, divisions, agents, servants, officers, directors, employees, and all those acting under their respective control and/or on their respective behalf and/or in concert with them, from making false and/or misleading statements related to Copperweld's product, CCA, including, but not limited to, further distribution of the FAQs and the false and misleading information contained therein;

(d) Preliminarily and permanently enjoining and restraining Defendants, their affiliates, subsidiaries, divisions, agents, servants, officers, directors, employees, and all those acting under their respective control and/or on their respective behalf and/or in concert with them, from continuing their unlawful acts related to Copperweld's product, CCA, in connection with the NFPA's NEC code-making process;

(e) Requiring Cerro to provide corrective advertising to all recipients of the FAQs, which accurately informs the recipient that CCA does not share any of the risks of aluminum wiring;

(f) Requiring Defendants to issue corrective public statements as to their sham studies regarding the safety of 14-gauge CCA;

(g) Awarding damages in an amount to be determined at trial, including but not limited to damages and lost profits by Copperweld, disgorgement of Cerro's profits and costs for corrective advertising; compensation for increased costs and delay related to the NFPA-related processes; trebled damages under 15 U.S.C. § 15, and/or punitive damages;

(h) Awarding pre-judgment and post-judgment interest, to the fullest extent allowable at law or in equity, on all damages;

(i) Awarding costs and disbursements, including all reasonable attorneys' fees; and

(j)    Granting such other further relief as this Court deems just and proper.

# JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff

demands a trial by jury on all issues triable by a jury.

Dated: Birmingham, AL
       August 23, 2022

                   /s/ Alan D. Mathis
                   Alan D. Mathis
                   **BUTLER SNOW LLP**
                   1819 Fifth Avenue North, Suite 1000
                   Birmingham, AL 35203
                   Telephone: (205) 297-2200
                   Facsimile: 297-2201
                   alan.mathis@butlersnow.com

                   Maura Wogan*
                   Craig B. Whitney*
                   Nicole Bergstrom*
                   Benjamin G. Murray*
                   **FRANKFURT KURNIT KLEIN & SELZ, PC**
                   28 Liberty Street
                   New York, New York 10005
                   Telephone: (212) 980-0120
                   Facsimile: (212) 593-9175
                   mwogan@fkks.com
                   cwhitney@fkks.com
                   nbergstrom@fkks.com
                   bmurray@fkks.com
                   * admitted *pro hac vice*

                   Michael B. Miller*
                   David J. Fioccola*
                   **MORRISON & FOERSTER LLP**
                   250 West 55th Street
                   New York, New York 10019-9601
                   Telephone:  (212) 468-8000
                   Facsimile:  (212) 468-7900

55

mbmiller@mofo.com
dfioccola@mofo.com
* admitted *pro hac vice*

*Attorneys for Plaintiff Copperweld Bimetallics, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have on this day served a true and correct copy of the above and foregoing pleading via the Court's CM/ECF filing system which will send notification to all participants.

This the 23rd day of August, 2022.

/s/ Alan D. Mathis
OF COUNSEL